RAY, GOVERNOR OF WASHINGTON, ET AL. v.
ATLANTIC RICHFIELD CO. ET AL.

No. 76–930.   Argued October 31, 1977—Decided March 6, 1978

—— F. Supp. ——, affirmed in part, reversed in part, and remanded.

WHITE, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART and BLACKMUN, JJ., joined; in all but Parts V and VII of which POWELL and STEVENS, JJ., joined; and in all but Parts IV and VI of which BRENNAN, MARSHALL, and REHNQUIST, JJ., joined. MARSHALL, J., filed an opinion concurring in part and dissenting in part, in which BRENNAN and REHNQUIST, JJ., joined, *post*, p. 180. STEVENS, J., filed an opinion concurring and dissenting in part, in which POWELL, J., joined, *post*, p. 187.

*Slade Gorton, pro se,* Attorney General of Washington, argued the cause for appellants. With him on the briefs were *Charles B. Roe, Jr.,* Senior Assistant Attorney General, *Robert E. Mack* and *Richard L. Kirkby,* Assistant Attorneys General, *David E. Engdahl,* Special Assistant Attorney General, *Christopher T. Bayley, pro se, Thomas A. Goeltz, John E. Keegan, Eldon V. C. Greenberg, Richard A. Frank, Thomas H. S. Brucker,* and *James N. Barnes.*

*Richard E. Sherwood* argued the cause for appellees. With him on the brief were *B. Boyd Hight, Ira M. Feinberg, Raymond W. Haman, James L. Robart,* and *David E. Wagoner.*[*]

---

[*]*Anthony F. Troy,* Attorney General, *James E. Ryan, Jr.,* Deputy Attorney General, and *John Hardin Young,* Assistant Attorney General, filed a brief for the Commonwealth of Virginia as *amicus curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed by *Eugene A. Massey* for the American Institute of Merchant Shipping, by *John M. Cannon* for the Mid-America Legal Foundation, and by *David R. Owen* for the Maritime Law Association of the United States.

Briefs of *amici curiae* were filed by *Solicitor General McCree* and *William F. Sheehan III* for the United States; by *Evelle J. Younger,*

MR. JUSTICE WHITE delivered the opinion of the Court.

Pursuant to the Ports and Waterways Safety Act of 1972 (PWSA), 86 Stat. 424, 33 U. S. C. § 1221 *et seq.* (1970 ed., Supp. V), and 46 U. S. C. § 391a (1970 ed., Supp. V), navigation in Puget Sound, a body of inland water lying along the northwest coast of the State of Washington,[1] is controlled in major respects by federal law. The PWSA also subjects to federal rule the design and operating characteristics of oil tankers.

This case arose when ch. 125, 1975 Wash. Laws, 1st Extr.

---

Attorney General, *E. Clement Shute, Jr.,* Assistant Attorney General, and *C. Foster Knight,* Deputy Attorney General, for the State of California, joined by certain officials for their respective States as follows: *Avrum M. Gross,* Attorney General of Alaska, and *Sanford Sagalkin,* Assistant Attorney General; *Arthur K. Bolton,* Attorney General of Georgia, and *Ann Estes,* Staff Assistant Attorney General; *Ronald Y. Amemiya,* Attorney General of Hawaii, and *Laurence K. Lau,* Deputy Attorney General; *John Ashcroft,* Attorney General of Missouri, and *Robert M. Lindholm,* Assistant Attorney General; *Robert P. Kane,* Attorney General of Pennsylvania, and *William Eichbaum,* Assistant Attorney General; and *Bronson C. LaFollette,* Attorney General of Wisconsin, and *Theodore Priebe,* Assistant Attorney General; and by certain officials for their respective States as follows: *Francis B. Burch,* Attorney General of Maryland, and *Warren K. Rich* and *Earl G. Schaffer,* Assistant Attorneys General; *Richard Wier,* Attorney General of Delaware; *Joseph E. Brennan,* Attorney General of Maine; *Warren Spannaus,* Attorney General of Minnesota; *Louis J. Lefkowitz,* Attorney General of New York; *Julius C. Michaelson,* Attorney General of Rhode Island; *Robert L. Shevin,* Attorney General of Florida; and *Wayne L. Kidwell,* Attorney General of Idaho.

[1] Puget Sound is an estuary consisting of 2,500 square miles of inlets, bays, and channels in the northwestern part of Washington. More than 200 islands are located within the Sound, and numerous marshes, tidal flats, wetlands, and beaches are found along the 2,000 miles of shoreline. The Sound's waters and shorelines provide recreational, scientific, and educational opportunities, as well as navigational and commercial uses, for Washington citizens and others. The Sound, which is connected to the Pacific Ocean by the Strait of Juan de Fuca, is constantly navigated by commercial and recreational vessels and is a water resource of great value to the State, as well as to the United States.

Sess., Wash. Rev. Code § 88.16.170 *et seq.* (Supp. 1975) (Tanker Law), was adopted with the aim of regulating in particular respects the design, size, and movement of oil tankers in Puget Sound. In response to the constitutional challenge to the law brought by the appellees herein, the District Court held that under the Supremacy Clause, Art. VI, cl. 2, of the Constitution, which declares that the federal law "shall be the supreme Law of the Land," the Tanker Law could not coexist with the PWSA and was totally invalid. *Atlantic Richfield Co.* v. *Evans,* No. C–75–648–M (WD Wash. Sept. 24, 1976).

I

Located adjacent to Puget Sound are six oil refineries having a total combined processing capacity of 359,500 barrels of oil per day. In 1971, appellee Atlantic Richfield Co. (ARCO) began operating an oil refinery at Cherry Point, situated in the northern part of the Sound. Since then, the crude oil processed at that refinery has been delivered principally by pipeline from Canada [2] and by tankers from the Persian Gulf; tankers will also be used to transport oil there from the terminus of the Trans-Alaska Pipeline at Valdez, Alaska. Of the 105 tanker deliveries of crude oil to the Cherry Point refinery from 1972 through 1975, 95 were by means of tankers in excess of 40,000 deadweight tons (DWT),[3] and, prior to the effective date of the Tanker Law, 15 of them were by means of tankers in excess of 125,000 DWT.

Appellee Seatrain Lines, Inc. (Seatrain), owns or charters 12 tanker vessels in domestic and foreign commerce, of which

---

[2] We were informed during oral argument by the Attorney General of Washington that the pipeline from Canada to Cherry Point is no longer in service. Tr. of Oral Arg. 6.

[3] The term "deadweight tons" is defined for purposes of the Tanker Law as the cargo-carrying capacity of a vessel, including necessary fuel oils, stores, and potable waters, as expressed in long tons (2,240 pounds per long ton).

four exceed 125,000 DWT. Seatrain also operates through a wholly owned subsidiary corporation a shipbuilding facility in New York City, where it has recently constructed or is constructing four tankers, each with a 225,000 DWT capacity.

On the day the Tanker Law became effective, ARCO brought suit in the United States District Court for the Western District of Washington, seeking a judgment declaring the statute unconstitutional and enjoining its enforcement. Seatrain was later permitted to intervene as a plaintiff. Named as defendants were the state and local officials responsible for the enforcement of the Tanker Law.[4] The complaint alleged that the statute was pre-empted by federal law, in particular the PWSA, and that it was thus invalid under the Supremacy Clause. It was also alleged that the law imposed an undue burden on interstate commerce in violation of the Commerce Clause, Art. I, § 8, cl. 3, and that it interfered with the federal regulation of foreign affairs. Pursuant to 28 U. S. C. §§ 2281, 2284, a three-judge court was convened to determine the case.

The case was briefed and argued before the District Court on the basis of a detailed stipulation of facts. Also before the court was the brief of the United States as *amicus curiae,* which contended that the Tanker Law was pre-empted in its entirety by the PWSA and other federal legislation.[5] The three-judge court agreed with the plaintiffs and the United States, ruling that all of the operative provisions of the Tanker Law were pre-empted, and enjoining appellants and their successors from enforcing the chapter.[6] We noted probable jurisdiction of

---

[4] Four environmental groups—Coalition Against Oil Pollution, National Wildlife Federation, Sierra Club, and Environmental Defense Fund, Inc.— and the prosecuting attorney for King County, Wash., intervened as defendants.

[5] The United States has since modified its views and no longer contends that the Tanker Law is in all respects pre-empted by federal law.

[6] The state defendants challenged the District Court's jurisdiction over them, asserting sovereign immunity under the Eleventh Amendment. They

the State's appeal, 430 U. S. 905 (1977), meanwhile having stayed the injunction. 429 U. S. 1035 (1977).

## II

The Court's prior cases indicate that when a State's exercise of its police power is challenged under the Supremacy Clause, "we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Rice* v. *Santa Fe Elevator Corp.*, 331 U. S. 218, 230 (1947); *Jones* v. *Rath Packing Co.*, 430 U. S. 519, 525 (1977). Under the relevant cases, one of the legitimate inquiries is whether Congress has either explicitly or implicitly declared that the States are prohibited from regulating the various aspects of oil-tanker operations and design with which the Tanker Law is concerned. As the Court noted in *Rice, supra,* at 230:

> "[The congressional] purpose may be evidenced in several ways. The scheme of federal regulation may be so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it. *Pennsylvania R. Co.* v. *Public Service Comm'n,* 250 U. S. 566, 569; *Cloverleaf Butter Co.* v. *Patterson,* 315 U. S. 148. Or the Act of Congress may touch a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject. *Hines* v. *Davidowitz,* 312 U. S. 52. Likewise, the object sought to be obtained by the federal law and the character of obligations imposed by it may reveal the same purpose. *Southern R. Co.* v. *Railroad*

recognized that in *Ex parte Young,* 209 U. S. 123 (1908), the Court held that the Eleventh Amendment does not bar suit in federal court against a state official for the purpose of obtaining an injunction against his enforcement of a state law alleged to be unconstitutional, but urged the District Court to overrule that decision or to restrict its application. The District Court declined to do so. The request is repeated here, and we reject it.

*Commission*, 236 U. S. 439; *Charleston & W. C. R. Co.* v. *Varnville Co.*, 237 U. S. 597; *New York Central R. Co.* v. *Winfield*, 244 U. S. 147; *Napier* v. *Atlantic Coast Line R. Co., supra.*"

Accord, *City of Burbank* v. *Lockheed Air Terminal, Inc.*, 411 U. S. 624, 633 (1973).

Even if Congress has not completely foreclosed state legislation in a particular area, a state statute is void to the extent that it actually conflicts with a valid federal statute. A conflict will be found "where compliance with both federal and state regulations is a physical impossibility . . . ," *Florida Lime & Avocado Growers, Inc.* v. *Paul*, 373 U. S. 132, 142–143 (1963), or where the state "law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines* v. *Davidowitz*, 312 U. S. 52, 67 (1941); *Jones* v. *Rath Packing Co., supra,* at 526, 540–541. Accord, *De Canas* v. *Bica,* 424 U. S. 351, 363 (1976).

## III

With these principles in mind, we turn to an examination of each of the three operative provisions of the Tanker Law. We address first Wash. Rev. Code § 88.16.180 (Supp. 1975), which requires both enrolled and registered [7] oil tankers of at least 50,000 DWT to take on a pilot licensed by the State of Washington while navigating Puget Sound. The District Court held that insofar as the law required a tanker "enrolled in the coastwise trade" to have a local pilot on board, it was in direct conflict with 46 U. S. C. §§ 215, 364. We agree.

Section 364 provides that "every coastwise seagoing steam vessel subject to the navigation laws of the United States , . . . not sailing under register, shall, when under way, . . . be under

---

[7] Enrolled vessels are those "engaged in domestic or coastwide trade or used for fishing," whereas registered vessels are those engaged in trade with foreign countries. *Douglas* v. *Seacoast Products, Inc.*, 431 U. S. 265, 272–273 (1977).

the control and direction of pilots licensed by the Coast Guard." [8] Section 215 adds that "[n]o State or municipal government shall impose upon pilots of steam vessels any obligation to procure a State or other license in addition to that issued by the United States . . . ." It goes on to explain that the statute shall not be construed to "affect any regulation established by the laws of any State, requiring vessels entering or leaving a port in any such State, *other than coastwise steam vessels*, to take a pilot duly licensed or authorized by the laws of such State . . . ." (Emphasis added.) The Court has long held that these two statutes read together give the Federal Government exclusive authority to regulate pilots on enrolled vessels and that they preclude a State from imposing its own pilotage requirements upon them. See *Anderson* v. *Pacific Coast S. S. Co.*, 225 U. S. 187 (1912); *Spraigue* v. *Thompson*, 118 U. S. 90 (1886). Thus, to the extent that the Tanker Law requires enrolled tankers to take on state-licensed pilots, the District Court correctly concluded, as the State now concedes, that it was in conflict with federal law and was therefore invalid.

While the opinion of the court below indicated that the pilot provision of the Tanker Law was void only to the extent that it applied to tankers enrolled in the coastwise trade, the judgment itself declared the statute null and void in its entirety. No part of the statute was excepted from the scope of the injunctive relief. The judgment was overly broad, for just as it is clear that States may not regulate the pilots of enrolled vessels, it is equally clear that they are free to impose pilotage requirements on registered vessels entering and leaving their

---

[8] Included within the definition of steam vessels are "[a]ll vessels, regardless of tonnage size, or manner of propulsion, and whether self-propelled or not, and whether carrying freight or passengers for hire or not, . . . that shall have on board liquid cargo in bulk which is— (A) inflammable or combustible, or (B) oil, of any kind or in any form, . . . or (C) designated as a hazardous polluting substance . . . ." 46 U. S. C. § 391a (2) (1970 ed., Supp. V).

ports. Not only does 46 U. S. C. § 215 so provide, as was noted above, but so also does § 101 (5) of the PWSA, 33 U. S. C. § 1221 (5) (1970 ed., Supp. V), which authorizes the Secretary of Transportation to "require pilots on self-propelled vessels engaged in the foreign trades in areas and under circumstances where a pilot is not otherwise required by State law to be on board until the State having jurisdiction of an area involved establishes a requirement for a pilot in that area or under the circumstances involved . . . ." Accordingly, as appellees now agree, the State was free to require registered tankers in excess of 50,000 DWT to take on a state-licensed pilot upon entering Puget Sound.

## IV

We next deal with § 88.16.190 (2) of the Tanker Law, which requires enrolled and registered oil tankers of from 40,000 to 125,000 DWT to possess all of the following "standard safety features":

"(a) Shaft horsepower in the ratio of one horsepower to each two and one-half deadweight tons; and

"(b) Twin screws; and

"(c) Double bottoms, underneath all oil and liquid cargo compartments; and

"(d) Two radars in working order and operating, one of which must be collision avoidance radar; and

"(e) Such other navigational position location systems as may be prescribed from time to time by the board of pilotage commissioners . . . ."

This section contains a proviso, however, stating that if the "tanker is in ballast or is under escort of a tug or tugs with an aggregate shaft horsepower equivalent to five percent of the deadweight tons of that tanker . . . ," the design requirements are not applicable. The District Court held invalid this alternative design/tug requirement of the Tanker Law. We agree insofar as we hold that the foregoing design require-

ments, standing alone, are invalid in the light of the PWSA and its regulatory implementation.

The PWSA contains two Titles representing somewhat overlapping provisions designed to insure vessel safety and the protection of the navigable waters, their resources, and shore areas from tanker cargo spillage. The focus of Title I, 33 U. S. C. §§ 1221–1227 (1970 ed., Supp. V), is traffic control at local ports; Title II's principal concern is tanker design and construction.[9] For present purposes the relevant part is Title II, 46 U. S. C. § 391a (1970 ed., Supp. V), which amended the Tank Vessel Act of 1936, Rev. Stat. § 4417a, as added, 49 Stat. 1889.

Title II begins by declaring that the protection of life, property, and the marine environment from harm requires the promulgation of "comprehensive minimum standards of design, construction, alteration, repair, maintenance, and operation" for vessels carrying certain cargoes in bulk, primarily oil and fuel tankers. § 391a (1). To implement the twin goals of providing for vessel safety and protecting the marine environment, it is provided that the Secretary of the Department in which the Coast Guard is located [10] "shall establish" such rules and regulations as may be necessary with respect to the design, construction, and operation of the covered vessels and with respect to a variety of related matters. § 391a (3). In issuing regulations, the Secretary is to consider the kinds and grades of cargo permitted to be on board such vessels, to consult with other federal agencies, and to identify separately the regulations established for vessel safety and those to protect marine environment. *Ibid.*

[9] The Senate Report compares Title I to "providing safer surface highways and traffic controls for automobiles," while Title II is likened to "providing safer automobiles to transit those highways." S. Rep. No. 92–724, pp. 9–10 (1972) (Senate Report).

[10] The Coast Guard is located in the Department of Transportation. Thus references to the "Secretary" are to the Secretary of that Department.

Section 391a (5) provides for inspection of vessels for compliance with the Secretary's safety regulations.[11] No vessel subject to Title II may have on board any of the specified cargoes until a certificate of inspection has been issued to the vessel and a permit endorsed thereon "indicating that such vessel is in compliance with the provisions of this section and the rules and regulations for vessel safety established hereunder, and showing the kinds and grades of such cargo that such vessel may have on board or transport." It is provided that in lieu of inspection under this section the Secretary is to accept from vessels of foreign nations valid certificates of inspection "recognized under law or treaty by the United States."

Title II also directs the Secretary to inspect tank vessels for compliance with the regulations which he is required to issue for the protection of the marine environment. § 391a (6).[12] Compliance with these separate regulations, which must

---

[11] The Secretary's current safety regulations with respect to the design and equipment of tank vessels appear at 46 CFR Parts 30–40 (1976). Section 31.05–1 of the regulations provides for the issuance of certificates of inspection to covered vessels complying with the applicable law and regulations and for endorsement thereon showing approval for the carriage of the particular cargoes specified. The regulation provides that "such endorsement shall serve as a permit for such vessel to operate."

[12] As directed by Title II, the Secretary, through his delegate, the Coast Guard, see 49 CFR § 1.46 (n) (4) (1976), has issued rules and regulations for protection of the marine environment relating to United States tank vessels carrying oil in domestic trade. 33 CFR Part 157 (1977). These regulations were initially designed to conform to the standards specified in a 1973 international convention, but have since been supplemented by additional requirements for new vessels going beyond the convention. 41 Fed. Reg. 54177 (1976). They have also been extended to vessels in the foreign trade, including foreign-flag vessels. *Ibid.* It appears that the Coast Guard is now engaged in a rulemaking proceeding which looks toward the imposition of still more stringent design and construction standards. 42 Fed. Reg. 24868 (1977).

satisfy specified standards,[13] and the consequent privilege of having on board the relevant cargo are evidenced by certificates of compliance issued by the Secretary or by appropriate endorsements on the vessels' certificates of inspection. Certificates are valid for the period specified by the Secretary and are subject to revocation when it is found that the vessel does not comply with the conditions upon which the certificate was issued.[14] In lieu of a certificate of compliance with his own environmental regulations relating to vessel design, construction, alteration, and repair, the Secretary may, but need not, accept valid certificates from foreign vessels evidencing compliance with rules and regulations issued under a treaty, convention, or agreement providing for reciprocity of recognition of certificates or similar documents. § 391a (7)(D).

This statutory pattern shows that Congress, insofar as design characteristics are concerned, has entrusted to the Secretary the duty of determining which oil tankers are sufficiently safe to be allowed to proceed in the navigable waters of the United States. This indicates to us that Congress intended uniform national standards for design and construction of tankers that would foreclose the imposition of different or more stringent state requirements. In particular, as we

---

[13] Title II in relevant part, 46 U. S. C. § 391a (7)(A) (1970 ed., Supp. V), provides:

"Such rules and regulations shall, to the extent possible, include but not be limited to standards to improve vessel maneuvering and stopping ability and otherwise reduce the possibility of collision, grounding, or other accident, and to reduce damage to the marine environment by normal vessel operations such as ballasting and deballasting, cargo handling, and other activities."

[14] It should also be noted that the Secretary has authority under Title II to insure that adequately trained personnel are in charge of tankers. He is authorized to certify "tankermen" and to state the kinds of cargo that the holder of such certificate is, in the judgment of the Secretary, qualified to handle aboard vessels with safety. 46 U. S. C. § 391a (9) (1970 ed., Supp. V).

see it, Congress did not anticipate that a vessel found to be in compliance with the Secretary's design and construction regulations and holding a Secretary's permit, or its equivalent, to carry the relevant cargo would nevertheless be barred by state law from operating in the navigable waters of the United States on the ground that its design characteristics constitute an undue hazard.

We do not question in the slightest the prior cases holding that enrolled and registered vessels must conform to "reasonable, nondiscriminatory conservation and environmental protection measures . . ." imposed by a State. *Douglas* v. *Seacoast Products, Inc.,* 431 U. S. 265, 277 (1977), citing *Smith* v. *Maryland,* 18 How. 71 (1855); *Manchester* v. *Massachusetts,* 139 U. S. 240 (1891); and *Huron Portland Cement Co.* v. *Detroit,* 362 U. S. 440 (1960). Similarly, the mere fact that a vessel has been inspected and found to comply with the Secretary's vessel safety regulations does not prevent a State or city from enforcing local laws having other purposes, such as a local smoke abatement law. *Ibid.* But in none of the relevant cases sustaining the application of state laws to federally licensed or inspected vessels did the federal licensing or inspection procedure implement a substantive rule of federal law addressed to the object also sought to be achieved by the challenged state regulation. *Huron Portland Cement Co.* v. *Detroit,* for example, made it plain that there was "no overlap between the scope of the federal ship inspection laws and that of the municipal ordinance . . ." there involved. *Id.,* at 446. The purpose of the "federal inspection statutes [was] to insure the seagoing safety of vessels . . . to affor[d] protection from the perils of maritime navigation," while "[b]y contrast, the sole aim of the Detroit ordinance [was] the elimination of air pollution to protect the health and enhance the cleanliness of the local community." *Id.,* at 445.

*Kelly* v. *Washington,* 302 U. S. 1 (1937), involved a similar situation. There, the Court concluded that the Federal Motor

Boat Act, although applicable to the vessels in question, was of limited scope and did not include provision for "the inspection of the hull and machinery of respondents' motor-driven tugs in order to insure safety or determine seaworthiness . . . ," as long as the tugs did not carry passengers, freight, or inflammable liquid cargo. *Id.*, at 8. It followed that state inspection to insure safety was not in conflict with federal law, the Court also holding that the limited federal regulations did not imply an intent to exclude state regulation of those matters not touched by the federal statute.

Here, we have the very situation that *Huron Portland Cement Co.* v. *Detroit* and *Kelly* v. *Washington* put aside. Title II aims at insuring vessel safety and protecting the marine environment; and the Secretary must issue all design and construction regulations that he deems necessary for these ends, after considering the specified statutory standards. The federal scheme thus aims precisely at the same ends as does § 88.16.190 (2) of the Tanker Law. Furthermore, under the PWSA, after considering the statutory standards and issuing all design requirements that in his judgment are necessary, the Secretary inspects and certifies each vessel as sufficiently safe to protect the marine environment and issues a permit or its equivalent to carry tank-vessel cargoes. Refusing to accept the federal judgment, however, the State now seeks to exclude from Puget Sound vessels certified by the Secretary as having acceptable design characteristics, unless they satisfy the different and higher design requirements imposed by state law. The Supremacy Clause dictates that the federal judgment that a vessel is safe to navigate United States waters prevail over the contrary state judgment.

Enforcement of the state requirements would at least frustrate what seems to us to be the evident congressional intention to establish a uniform federal regime controlling the design of oil tankers. The original Tank Vessel Act, amended

by Title II, sought to effect a "reasonable and uniform set of rules and regulations concerning ship construction . . . ," H. R. Rep. No. 2962, 74th Cong., 2d Sess., 2 (1936); and far from evincing a different purpose, the Title II amendments strongly indicate that insofar as tanker design is concerned, Congress anticipated the enforcement of federal standards that would pre-empt state efforts to mandate different or higher design requirements.[15]

That the Nation was to speak with one voice with respect to tanker-design standards is supported by the legislative history of Title II, particularly as it reveals a decided congressional preference for arriving at international standards for building tank vessels. The Senate Report recognizes that vessel design "has traditionally been an area for international rather than national action," and that "international solutions in this area are preferable since the problem of marine pollution is world-wide."[16]  Senate Report 23.  Congress did provide that the Secretary's safety regulations would not

---

[15] The Court has previously observed that ship design and construction standards are matters for national attention. In *Kelly* v. *Washington*, 302 U. S. 1 (1937), in the course of upholding state inspection of the particular vessels there involved, the Court stated that the state law was "a comprehensive code" and that

"it has provisions which may be deemed to fall within the class of regulations which Congress alone can provide. For example, Congress may establish standards and designs for the structure and equipment of vessels, and may prescribe rules for their operation, which could not properly be left to the diverse action of the States. The State of Washington might prescribe standards, designs, equipment and rules of one sort, Oregon another, California another, and so on." *Id.*, at 14–15.

Here, Congress has taken unto itself the matter of tanker-design standards, and the Tanker Law's design provisions are unenforceable.

[16] Elsewhere in the Senate Report it is stated: "The committee fully concurs that multilateral action with respect to comprehensive standards for the design, construction, maintenance and operation of tankers for the protection of the marine environment would be far preferable to unilateral imposition of standards." Senate Report 23.

apply to foreign ships holding compliance certificates under regulations arrived at by international agreement; but, in the end, the environmental protection regulations were made applicable to foreign as well as to American vessels since it was thought to be necessary for the achievement of the Act's purposes.[17]

Although not acceding to the request of those who thought that foreign vessels should be completely exempt from regulation under Title II,[18] Congress did not abandon the effort to achieve international agreement on what the proper design standards should be. It wrote into Title II a deferral procedure, requiring the Secretary at the outset to transmit his proposed environmental protection rules and regulations with respect to vessel design to the appropriate international forums for consideration as international standards. § 391a (7)(B). In order to facilitate the international consideration of these design requirements, Title II specified that the rules and regulations governing foreign vessels and United States vessels engaged in foreign trade could not become effective before January 1, 1974, unless they were consonant with an international agreement. § 391a (7)(C). As noted by the Senate Report, this requirement demonstrated the "committee's strong intention that standards for the protection of the marine environment be adopted, multilaterally if possible, but adopted in any event." Senate Report 28.

Congress expressed a preference for international action and

---

[17] The Senate Report notes that eliminating foreign vessels from Title II would be "ineffective, and possibly self-defeating," because approximately 85% of the vessels in the navigable waters of the United States are of foreign registry. *Id.*, at 22. The Report adds that making the Secretary's regulations applicable only to American ships would put them at a competitive disadvantage with foreign-flag ships. *Ibid.*

[18] The Department of State and the Department of Transportation, as well as 12 foreign nations, expressed concern about Title II's authorization of the unilateral imposition of design standards on foreign vessels. *Id.*, at 23.

expressly anticipated that foreign vessels would or could be considered sufficiently safe for certification by the Secretary if they satisfied the requirements arrived at by treaty or convention; it is therefore clear that Title II leaves no room for the States to impose different or stricter design requirements than those which Congress has enacted with the hope of having them internationally adopted or has accepted as the result of international accord. A state law in this area, such as the first part of § 88.16.190 (2), would frustrate the congressional desire of achieving uniform, international standards and is thus at odds with "the object sought to be obtained by [Title II] and the character of obligations imposed by it . . . ." *Rice* v. *Santa Fe Elevator Corp.*, 331 U. S., at 230. In this respect, the District Court was quite correct.[19]

## V

Of course, that a tanker is certified under federal law as a safe vessel insofar as its design and construction characteristics are concerned does not mean that it is free to ignore otherwise valid state or federal rules or regulations that do

---

[19] We are unconvinced that because Title II speaks of the establishment of comprehensive "minimum standards" *Florida Lime & Avocado Growers, Inc.* v. *Paul*, 373 U. S. 132 (1963), requires recognition of state authority to impose higher standards than the Secretary has prescribed. In that case, we sustained the state regulation against claims of pre-emption, but we did not rely solely on the statutory reference to "minimum standards" or indicate that it furnished a litmus-paper test for resolving issues of pre-emption. Indeed, there were other provisions in the Federal Act in question that "militate[d] even more strongly against federal displacement of [the] state regulations." *Id.*, at 148. Furthermore, the federal regulations claimed to pre-empt state law were drafted and administered by local organizations and were "designed to do no more than promote orderly competition among the South Florida [avocado] growers." *Id.*, at 151. Here it is sufficiently clear that Congress directed the promulgation of standards on the national level, as well as national enforcement, with vessels having design characteristics satisfying federal law being privileged to carry tank-vessel cargoes in United States waters.

not constitute design or construction specifications. Registered vessels, for example, as we have already indicated, must observe Washington's pilotage requirement. In our view, both enrolled and registered vessels must also comply with the provision of the Tanker Law that requires tug escorts for tankers over 40,000 DWT that do not satisfy the design provisions specified in § 88.16.190 (2). This conclusion requires analysis of Title I of the PWSA, 33 U. S. C. §§ 1221–1227 (1970 ed., Supp. V).

### A

In order to prevent damage to vessels, structures, and shore areas, as well as environmental harm to navigable waters and the resources therein that might result from vessel or structure damage, Title I authorizes the Secretary to establish and operate "vessel traffic services and systems" for ports subject to congested traffic,[20] as well as to require ships to comply with the systems and to have the equipment necessary to do so. §§ 1221 (1) and (2). The Secretary may "control vessel traffic" under various hazardous conditions by specifying the times for vessel movement, by establishing size and speed limitations and vessel operating conditions, and by restricting

---

[20] From 1950 until the PWSA was enacted, the Coast Guard carried out its port safety program pursuant to a delegation from the President of his authority under the Magnuson Act, 50 U. S. C. § 191. That Act based the President's authority to promulgate rules governing the operation and inspection of vessels upon his determination that the country's national security was endangered. H. R. Rep. No. 92–563, p. 2 (1971) (House Report). The House Committee that considered Title I of the PWSA intended it to broaden the Coast Guard's authority to establish rules for port safety and protection of the environment. The Committee Report states:

"The enactment of H. R. 8140 would serve an important dual purpose. First, it would bolster the Coast Guard's authority and capability to handle adequately the serious problems of marine safety and water pollution that confront us today. Second, it would remedy the long-standing problem concerning the statutory basis for the Coast Guard's port safety program." *Ibid.*

vessel operation to those vessels having the particular operating characteristics which he considers necessary for safe operation under the circumstances. § 1221 (3). In addition, the Secretary may require vessels engaged in foreign trade to carry pilots until the State having jurisdiction establishes a pilot requirement, § 1221 (5); he may establish minimum safety equipment requirements for shore structures, § 1221 (7); and he may establish waterfront safety zones or other measures for limited, controlled, or conditional access when necessary for the protection of vessels, structures, waters, or shore areas, § 1221 (8).

In carrying out his responsibilities under the Act, the Secretary may issue rules and regulations. § 1224. In doing so, he is directed to consider a wide variety of interests that might affect the exercise of his authority, such as possible environmental impact, the scope and degree of the hazards involved, and "vessel traffic characteristics including minimum interference with the flow of commercial traffic, traffic volume, the sizes and types of vessels, the usual nature of local cargoes, and similar factors." § 1222 (e). Section 1222 (b) provides that nothing in Title I is to "prevent a State or political subdivision thereof from prescribing for structures only higher safety equipment requirements or safety standards than those which may be prescribed pursuant to this chapter."

Exercising this authority, the Secretary, through his delegate, the Coast Guard, has issued Navigation Safety Regulations, 33 CFR Part 164 (adopted at 42 Fed. Reg. 5956 (1977)). Of particular importance to this case, he has promulgated the Puget Sound Vessel Traffic System containing general rules, communication rules, vessel movement reporting requirements, a traffic separation scheme, special rules for ship movement in Rosario Strait, descriptions and geographic coordinates of the separation zones and traffic lanes, and a specification for precautionary areas and reporting points.[21]  33 CFR Part 161,

---

[21] Local Coast Guard authorities have published an operating manual

Subpart B (1976), as amended, 42 Fed. Reg. 29480 (1977). There is also delegated to Coast Guard district commanders and captains of ports the authority to exercise the Secretary's powers under § 1221 (3) to direct the anchoring, mooring, and movements of vessels; temporarily to establish traffic routing schemes; and to specify vessel size and speed limitations and operating conditions. 33 CFR § 160.35 (1976). Traffic in Rosario Strait is subject to a local Coast Guard rule prohibiting "the passage of more than one 70,000 DWT vessel through Rosario Strait in either direction at any given time." During the periods of bad weather, the size limitation is reduced to approximately 40,000 DWT. App. 65.

## B

A tug-escort provision is not a design requirement, such as is promulgated under Title II. It is more akin to an operating rule arising from the peculiarities of local waters that call for special precautionary measures, and, as such, is a safety measure clearly within the reach of the Secretary's authority under §§ 1221 (3)(iii) and (iv) to establish "vessel size and speed limitations and vessel operating conditions" and to restrict vessel operation to those with "particular operating characteristics and capabilities . . . ." Title I, however, merely authorizes and does not require the Secretary to issue regulations to implement the provisions of the Title; and assuming that § 1222 (b) prevents a State from issuing "higher safety equipment requirements or safety standards," see *infra*, at 174, it does so only with respect to those requirements or standards "which may be prescribed pursuant to this chapter."

The relevant inquiry under Title I with respect to the State's power to impose a tug-escort rule is thus whether the Secretary has either promulgated his own tug requirement for Puget Sound tanker navigation or has decided that no such

---

containing the vessel traffic system for Puget Sound and explanatory materials. App. 155.

requirement should be imposed at all. It does not appear to us that he has yet taken either course. He has, however, issued an advance notice of proposed rulemaking, 41 Fed. Reg. 18770 (1976), to amend his Navigation Safety Regulations issued under Title I, 33 CFR Part 164 (1977), so as to require tug escorts for certain vessels operating in confined waters.[22] The notice says that these rules, if adopted, "are intended to provide uniform guidance for the maritime industry and Captains of the Port." 41 Fed. Reg. 18771 (1976). It may be that rules will be forthcoming that will pre-empt the State's present tug-escort rule, but until that occurs, the State's requirement need not give way under the Supremacy Clause.[23]

Nor for constitutional purposes does it make substantial difference that under the Tanker Law those vessels that satisfy the State's design requirements are in effect exempted from

---

[22] The advance notice of proposed rulemaking states: "The Coast Guard is considering amending Part 164 of Title 33, Code of Federal Regulations to require minimum standards for tug assistance for vessels operating in confined waters to reduce the potential for collisions, rammings, and groundings in these areas." 41 Fed. Reg. 18770 (1976). It states that the following factors will be considered in developing the rules: size of vessel, displacement, propulsion, availability of multiple screws or bow thrusters, controllability, type of cargo, availability of safety standards, and actual or predicted adverse weather conditions. *Id.*, at 18771.

[23] Appellees insist that the Secretary through his Coast Guard delegates has already exercised his authority to require tugs in Puget Sound to the extent he deems necessary and that the State should therefore not be permitted to impose stricter provisions. Appellees submit letters or other evidence indicating that the local Coast Guard authorities have required tug escorts for carriers of liquefied petroleum gas and on one occasion for another type of vessel. This evidence is not part of the record before us; but even accepting it, we cannot say that federal authorities have settled upon whether and in what circumstances tug escorts for oil tankers in Puget Sound should be required. The entire subject of tug escorts has been placed on the Secretary's agenda, seemingly for definitive action, by the notice of proposed rulemaking referred to in the text.

the tug-escort requirement.[24]   Given the validity of a general rule prescribing tug escorts for all tankers, Washington is also privileged, insofar as the Supremacy Clause is concerned, to waive the rule for tankers having specified design character-istics.[25]   For this reason, we conclude that the District Court erred in holding that the alternative tug requirement of § 88.16.190 (2) was invalid because of its conflict with the PWSA.

## VI

We cannot arrive at the same conclusion with respect to the remaining provision of the Tanker Law at issue here.   Sec-tion 88.16.190 (1) excludes from Puget Sound under any circumstances any tanker in excess of 125,000 DWT.   In our

---

[24] In fact, at the time of trial all tankers entering Puget Sound were required to have a tug escort, for no tanker then afloat had all of the design features required by the Tanker Law.   App. 66.

[25] We do not agree with appellees' assertion that the tug-escort provi-sion, which is an alternative to the design requirements of the Tanker Law, will exert pressure on tanker owners to comply with the design standards and hence is an indirect method of achieving what they submit is beyond state power under Title II.   The cost of tug escorts for all of appellee ARCO's tankers in Puget Sound is estimated at $277,500 per year.   While not a negligible amount, it is only a fraction of the estimated cost of outfitting a single tanker with the safety features required by § 88.16.190 (2).   The Office of Technology Assessment of Congress has estimated that constructing a new tanker with a double bottom and twin screws, just two of the required features, would add roughly $8.8 million to the cost of a 150,000 DWT tanker.   Thus, contrary to the appellees' contention, it is very doubtful that the provision will pressure tanker operators into com-plying with the design standards specified in § 88.16.190 (2).   While the tug provision may be viewed as a penalty for noncompliance with the State's design requirements, it does not "stan[d] as an obstacle to the accom-plishment and execution of the full purposes and objectives of Congress." *Hines* v. *Davidowitz,* 312 U. S. 52, 67 (1941).   The overall effect of § 88.16.190 (2) is to require tankers of over 40,000 DWT to have a tug escort while they navigate Puget Sound, a result in no way inconsistent with the PWSA as it is currently being implemented.

view, this provision is invalid in light of Title I and the Secretary's actions taken thereunder.

We begin with the premise that the Secretary has the authority to establish "vessel size and speed limitations," § 1221 (3)(iii), and that local Coast Guard officers have been authorized to exercise this power on his behalf. Furthermore, § 1222 (b), by permitting the State to impose higher equip- ·ment or safety standards "for structures only," impliedly forbids higher state standards for vessels. The implication is strongly supported by the legislative history of the PWSA. The House Report explains that the original wording of the bill did "not make it absolutely clear that the Coast Guard regulation of vessels preempts state action in this field" and says that § 1222 (b) was amended to provide "a positive statement retaining State jurisdiction over structures and making clear that State regulation of vessels is not contem- plated." House Report 15.

. Relying on the legislative history, the appellants argue that the preclusive effect of § 1222 (b) is restricted to vessel equip- ment requirements. The statute, however, belies this argu- ment, for it expressly reaches vessel "safety standards" as well as equipment. A limitation on vessel size would seem to fall squarely within the category of safety standards, since the Secretary's authority to impose size limits on vessels navigat- ing Puget Sound is designed to prevent damage to vessels and to the navigable waters and is couched in terms of controlling vessel traffic in areas "which he determines to be especially hazardous."

The pertinent inquiry at this point thus becomes whether the Secretary, through his delegate, has addressed and acted upon the question of size limitations. Appellees and the United States insist that he has done so by his local navigation rule with respect to Rosario Strait: The rule prohibits the passage of more than one 70,000 DWT vessel through Rosario Strait in either direction at any given time, and in periods of

bad weather, the "size limitation" is reduced to approximately 40,000 DWT. On the record before us, it appears sufficiently clear that federal authorities have indeed dealt with the issue of size and have determined whether and in what circumstances tanker size is to limit navigation in Puget Sound. The Tanker Law purports to impose a general ban on large tankers, but the Secretary's response has been a much more limited one. Because under § 1222 (b) the State may not impose higher safety standards than those prescribed by the Secretary under Title I, the size limitation of § 88.16.190 (1) may not be enforced.

There is also force to the position of appellees and the United States that the size regulation imposed by the Tanker Law, if not pre-empted under Title I, is similar to or indistinguishable from a design requirement which Title II reserves to the federal regime. This may be true if the size limit represents a state judgment that, as a matter of safety and environmental protection generally, tankers should not exceed 125,000 DWT. In that event, the State should not be permitted to prevail over a contrary design judgment made by federal authorities in pursuit of uniform national and international goals. On the other hand, if Washington's exclusion of large tankers from Puget Sound is in reality based on water depth in Puget Sound or on other local peculiarities, the Tanker Law in this respect would appear to be within the scope of Title I, in which event also state and federal law would represent contrary judgments, and the state limitation would have to give way.[26]

Our conclusion as to the State's ban on large tankers is consistent with the legislative history of Title I. In exercising his authority under the Title, the Secretary is directed

---

[26] It appears that the minimum water depth in Rosario Strait is 60 feet, App. 65, which according to the design standards used by the United States at the 1973 International Conference on Marine Pollution would accommodate vessels well in excess of 120,000 DWT. *Id.*, at 80.

to consult with other agencies in order "to assure consistency of regulations . . . ," § 1222 (c), and also to "consider fully the wide variety of interests which may be affected . . . ." § 1222 (e). These twin themes—consistency of regulation and thoroughness of consideration—reflect the substance of the Committee Reports. The House Report indicates that a good number of the witnesses who testified before the House subcommittee stated that one of the strong points of Title I was "the imposition of federal control in the areas envisioned by the bill which will insure regulatory and enforcement uniformity throughout all the covered areas." House Report 8.[27]   Such a view was expressed by the Commandant of the

---

[27] During the hearings in the House, for example, Representative Keith expressed concern that States might on their own enact regulations restricting the size of vessels, noting that Delaware had already done so. He stated that "[w]e do not want the States to resort to individual actions that adversely affect our national interest." Hearings on H. R. 867, H. R. 3635, H. R. 8140 before the Subcommittee on Coast Guard, Coast and Geodetic Survey, and Navigation of the House Committee on Merchant Marine and Fisheries, 92d Cong., 1st Sess., 30 (1971). The Commandant of the Coast Guard, Admiral Bender, responded that the Coast Guard "believe[s] it is preferable for the approach to the problem of the giant tankers in particular to be resolved on an international basis." Ibid.

A representative of the Sierra Club testified before the Senate committee considering the PWSA and suggested the advisability of regulations limiting the size of vessels. Hearings on S. 2074 before the Senate Committee on Commerce, 92d Cong., 1st Sess., 78 (1971). In response to this suggestion, Senator Inouye questioned whether the necessary result of such a regulation would not be an increase in the number of tankers, so as to meet the Nation's requirements for oil. The Sierra Club witness acknowledged that there was "some controversy even among the oil company people as to which would be the most hazardous, more smaller ships or fewer bigger ships." Id., at 81. This statement is consistent with the stipulation of facts, App. 84, which states:

"Experts differ and there is good faith dispute as to whether the movement of oil by a smaller number of tankers in excess of 125,000 DWT in Puget Sound poses an increased risk of oil spillage compared to the risk from movement of a similar amount of oil by a larger number of smaller tankers in Puget Sound."

Coast Guard, Admiral Bender, who pointed out that with a federally operated traffic system, the necessary research and development could be carried out by a single authority and then utilized around the country "with differences applied . . . to the particular ports . . . ." *Ibid.* He added that the same agency of the Federal Government that developed the traffic systems should then be responsible for enforcing them. *Ibid.*

While the House Report notes the importance of uniformity of regulation and enforcement, the Senate Report stresses the careful consideration that the Secretary must give to various factors before exercising his authority under Title I. It states that the Secretary "is required to balance a number of considerations including the scope and degree of hazard, vessel traffic characteristics, conditions peculiar to a particular port or waterway, environmental factors, economic impact, and so forth." Senate Report 34. It was also "anticipated that the exercise of the authority provided . . . regarding the establishment of vessels size and speed limitations [would] not be imposed universally, but rather [would] be exercised with due consideration to the factors" set forth above and with due regard for "such matters as combinations of horsepower, drafts of vessels, rivers, depth and width of channels, design types of vessels involved, and other relevant circumstances." *Id.,* at 33.

We read these statements by Congress as indicating that it desired someone with an overview of all the possible ramifications of the regulation of oil tankers to promulgate limitations on tanker size and that he should act only after balancing all of the competing interests. While it was not anticipated that the final product of this deliberation would be the promulgation of traffic safety systems applicable across the board to all United States ports, it was anticipated that there would be a single decisionmaker, rather than a different one in each State.

Against this background, we think the pre-emptive impact

of § 1222 (b) is an understandable expression of congressional intent. Furthermore, even without § 1222 (b), we would be reluctant to sustain the Tanker Law's absolute ban on tankers larger than 125,000 DWT. The Court has previously recognized that "where failure of . . . federal officials affirmatively to exercise their full authority takes on the character of a ruling that no such regulation is appropriate or approved pursuant to the policy of the statute," States are not permitted to use their police power to enact such a regulation. *Bethlehem Steel Co.* v. *New York State Labor Relations Board,* 330 U. S. 767, 774 (1947); *Napier* v. *Atlantic Coast Line R. Co.,* 272 U. S. 605 (1926). We think that in this case the Secretary's failure to promulgate a ban on the operations of oil tankers in excess of 125,000 DWT in Puget Sound takes on such a character. As noted above, a clear policy of the statute is that the Secretary shall carefully consider "the wide variety of interests which may be affected by the exercise of his authority," § 1222(e), and that he shall restrict the application of vessel size limitations to those areas where they are particularly necessary. In the case of Puget Sound, the Secretary has exercised his authority in accordance with the statutory directives and has promulgated a vessel-traffic-control system which contains only a narrow limitation on the operation of supertankers. This being the case, we conclude that Washington is precluded from enforcing the size limitation contained in the Tanker Law.[28]

_____

[28] We find no support for the appellants' position in the other federal environmental legislation they cite, *i. e.,* the Federal Water Pollution Control Act Amendments of 1972, 86 Stat. 816, 33 U. S. C. § 1251 *et seq.* (1970 ed., Supp. V); the Coastal Zone Management Act of 1972, 86 Stat. 1280, 16 U. S. C. § 1451 *et seq.* (1976 ed.); and the Deepwater Port Act of 1974, 88 Stat. 2126, 33 U. S. C. § 1501 *et seq.* (1970 ed., Supp. V). While those statutes contemplate cooperative state-federal regulatory efforts, they expressly state that intent, in contrast to the PWSA. Furthermore, none of them concerns the regulation of the design

## VII

We also reject appellees' additional constitutional challenges to the State's tug-escort requirement for vessels not satisfying its design standards.[29]    Appellees contend that this provision, even if not pre-empted by the PWSA, violates the Commerce Clause because it is an indirect attempt to regulate the design and equipment of tankers, an area of regulation that appellees contend necessitates a uniform national rule. We have previously rejected this claim, concluding that the provision may be viewed as simply a tug-escort requirement since it does not have the effect of forcing compliance with the design specifications set forth in the provision.    See n. 25, *supra.*    So viewed, it becomes apparent that the Commerce Clause does not prevent a State from enacting a regulation of this type.    Similar in its nature to a local pilotage requirement, a requirement that a vessel take on a tug escort when entering a particular body of water is not the type of regulation that demands a uniform national rule.    See *Cooley* v. *Board of Wardens,* 12 How. 299 (1852).    Nor does it appear from the record that the requirement impedes the free and

or size of oil tankers, an area in which there is a compelling need for uniformity of decisionmaking.

Appellees and the United States as *amicus curiae* urge that the Tanker Law's size limit also conflicts with the policy of the Merchant Marine Act, 1936, 49 Stat. 1985, as amended, 46 U. S. C. § 1101 *et seq.* (1970 ed. and Supp. V), and the tanker construction program established thereunder by the Maritime Administration in implementation of its duty under the Act to develop an adequate and well-balanced merchant fleet.    Under this program the construction of tankers of various sizes is subsidized, including tankers far in excess of 125,000 DWT.    The Maritime Administration has rejected suggestions that no subsidies be offered for the building of the larger tankers.    There is some force to the argument, but we need not rely on it.

[29] Although the District Court did not reach these additional grounds, the issues involved are legal questions, and the record seems sufficiently complete to warrant their resolution here without a remand to the District Court.

efficient flow of interstate and foreign commerce, for the cost of tug escort for a 120,000 DWT tanker is less than one cent per barrel of oil and the amount of oil processed at Puget Sound refineries has not declined as a result of the provision's enforcement. App. 68. Accordingly, we hold that § 88.16.190 (2) of the Tanker Law is not invalid under the Commerce Clause.

Similarly, we cannot agree with the additional claim that the tug-escort provision interferes with the Federal Government's authority to conduct foreign affairs. Again, appellees' argument is based on the contention that the overall effect of § 88.16.190 (2) is to coerce tanker owners into outfitting their vessels with the specified design requirements. Were that so, we might agree that the provision constituted an invalid interference with the Federal Government's attempt to achieve international agreement on the regulation of tanker design. The provision as we view it, however, does no more than require the use of tug escorts within Puget Sound, a requirement with insignificant international consequences. We, therefore, decline to declare § 88.16.190 (2) invalid for either of the additional reasons urged by appellees.

Accordingly, the judgment of the three-judge District Court is affirmed in part and reversed in part, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

MR. JUSTICE MARSHALL, with whom MR. JUSTICE BRENNAN and MR. JUSTICE REHNQUIST join, concurring in part and dissenting in part.

The Washington Tanker Law at issue here has three operative provisions: (1) a requirement that every oil tanker of 50,000 deadweight tons (DWT) or larger employ a pilot licensed by the State of Washington while navigating Puget Sound and adjacent waters, Wash. Rev. Code § 88.16.180 (Supp. 1975); (2) a requirement that every oil tanker of from 40,000 to 125,000 DWT either possess certain safety features or

utilize tug escorts while operating in Puget Sound, § 88.16.190 (2); and (3) a size limitation, barring tankers in excess of 125,000 DWT from the Sound, § 88.16.190 (1).

I agree with the Court that the pilotage requirement is pre-empted only with respect to enrolled vessels. I also agree that the tug-escort requirement is fully valid, at least until such time as the Secretary of Transportation or his delegate promulgates a federal tug-escort rule or decides, after full consideration, that no such rule is necessary. I therefore join Parts I, II, III, V, and VII of the Court's opinion.

In the current posture of this case, however, I see no need to speculate, as the Court does, on the validity of the safety features alternative to the tug requirement. Since the effective date of the Tanker Law, all tankers—including those owned or chartered by appellees—have employed tug escorts rather than attempting to satisfy the alternative safety requirements. The relative expense of compliance, moreover, makes it extremely unlikely, at least for the foreseeable future, that any tankers will be constructed or redesigned to meet the law's requirements.[1] Indeed, the Court itself concludes that § 88.16.190 (2) "may be viewed as simply a tug-escort requirement since it does not have the effect of forcing compliance with the design specifications set forth in the provision." *Ante,* at 179; see *ante,* at 173 n. 25, and 180. Accordingly, I cannot join Part IV of the Court's opinion.

I also cannot agree with the Court's conclusion in Part VI of its opinion that the size limitation contained in the Tanker Law

---

[1] According to the record, no tanker currently afloat has all the design features prescribed by the Tanker Law. Neither Atlantic Richfield nor Seatrain has plans to modify any tankers currently in operation to satisfy the design standards, "because such retrofit is not economically feasible under current and anticipated market conditions." App. 67. Moreover, the vessels being constructed by Seatrain will not meet the majority of the design requirements, and, as the Court convincingly demonstrates, *ante,* at 173 n. 25, the Tanker Law is not likely to induce tanker owners to incorporate the specified design features into new tankers.

is invalid under the Supremacy Clause. To reach this conclusion, the Court relies primarily on an analysis of Title I of the PWSA and the Secretary of Transportation's actions thereunder. I agree with the Court that the Secretary has authority to establish vessel size limitations based on the characteristics of particular waters,[2] and that a State is not free to impose more stringent requirements once the Secretary has exercised that authority or has decided, after balancing all of the relevant factors, that a size limitation would not be appropriate. On the other hand, Title I does not by its own force pre-empt all state regulation of vessel size, since it "merely authorizes and does not require the Secretary to issue regulations to implement the provisions of the Title." *Ante,* at 171. Thus, as the Court notes, "[t]he pertinent inquiry at this point . . . [is] whether the Secretary, through his delegate, has addressed and acted upon the question of size limitations." *Ante,* at 174.

The Court concludes that the Secretary's delegate, the Coast Guard, has in fact considered the issue of size limitations for Puget Sound and reached a judgment contrary to the one embodied in the Tanker Law. Under well-established principles, however, state law should be displaced " 'only to the extent necessary to protect the achievement of the aims of' "

---

[2] The relevant provision of Title I states:

"In order to prevent damage to, or the destruction or loss of any vessel, bridge, or other structure on or in the navigable waters of the United States, or any land structure or shore area immediately adjacent to those waters; and to protect the navigable waters and the resources therein from environmental harm resulting from vessel or structure damage, destruction, or loss, the Secretary of the department in which the Coast Guard is operating may—

.          .          .          .          .

"(3) control vessel traffic in areas which he determines to be especially hazardous, or under conditions of reduced visibility, adverse weather, vessel congestion, or other hazardous circumstances by—

.          .          .          .          .

"(iii) establishing vessel size and speed limitations and vessel operating conditions . . . ." 33 U. S. C. § 1221 (3) (iii) (1970 ed., Supp. V).

federal law; whenever possible, we should "reconcile 'the operation of both statutory schemes with one another rather than holding [the state scheme] completely ousted.' " *Merrill Lynch, Pierce, Fenner & Smith* v. *Ware,* 414 U. S. 117, 127 (1973), quoting *Silver* v. *New York Stock Exchange,* 373 U. S. 341, 361, 357 (1963); accord, *De Canas* v. *Bica,* 424 U. S. 351, 357–358, n. 5 (1976). Viewed in light of these principles, the record simply does not support the Court's finding of conflict between state and federal law.

The Coast Guard's unwritten "local navigation rule," which prohibits passage of more than one 70,000 DWT vessel through Rosario Strait at any given time, is the sole evidence cited by the Court to show that size limitations for Puget Sound have been considered by federal authorities. *Ante,* at 174–175. On this record, however, the rule cannot be said to reflect a determination that the size limitations set forth in the Tanker Law are inappropriate or unnecessary. First, there is no indication that in establishing the vessel traffic rule for Rosario Strait the Coast Guard considered the need for promulgating size limitations for the entire Sound.[3] Second, even assuming that the Rosario Strait rule resulted from consideration of the size issue with respect to the entire area, appellees have not demon-

---

[3] The Rosario Strait "size limitation" is not contained in any written rule or regulation, and the record does not indicate how it came into existence. The only reference in the record is the following statement in the stipulation of facts:

"The Coast Guard prohibits the passage of more than one 70,000 DWT vessel through Rosario Strait in either direction at any given time. During periods of bad weather, the size limitation is reduced to approximately 40,000 DWT." App. 65.

The Puget Sound Vessel Traffic System, 33 CFR Part 161, Subpart B (1976), as amended, 42 Fed. Reg. 29480 (1977), does not contain any size limitation, and the necessity for such a limitation apparently was never considered during the rulemaking process. See 38 Fed. Reg. 21228 (1973) (notice of proposed rulemaking); 39 Fed. Reg. 25430 (1974) (summary of comments received during rulemaking).

strated that the rule evinces a judgment contrary to the provisions of the Tanker Law. Under the express terms of the PWSA, the existence of local vessel-traffic-control schemes must. be weighed in the balance in determining whether, and to what extent, federal size limitations should be imposed.[4] There is no evidence in the record that the Rosario Strait "size limitation" was in existence or even under consideration prior to passage of the Tanker Law.[5] Thus appellees have left unrebutted the inference that the Coast Guard's own limited rule was built upon, and is therefore entirely consistent with, the framework already created by the Tanker Law's restrictions.

Perhaps in recognition of the tenuousness of its finding of conflict with federal regulation under Title I, the Court suggests that the size limitation imposed by the Tanker Law might also be pre-empted under Title II of the PWSA. *Ante,* at 175. In particular, the Court theorizes that the state rule might be pre-empted if it "represents a state judgment that, as a matter of safety and environmental protection *generally,* tankers should not exceed 125,000 DWT." *Ibid.* (Emphasis added.) It is clear, however, that the Tanker Law was not merely a reaction to the problems arising out of tanker operations in general, but instead was a measure tailored to respond to unique local conditions—in particular, the unusual

---

[4] Title I provides in relevant part:
"In determining the need for, and the substance of, any rule or regulation or the exercise of other authority hereunder the Secretary shall, among other things, consider—

  .          .          .          .          .

"(6) existing vessel traffic control systems, services, and schemes; and
"(7) local practices and customs . . . ." 33 U. S. C. § 1222 (e) (1970 ed., Supp. V).

[5] The stipulation of facts does not specify when the size rule for Rosario Strait was established. The rule apparently was in force at the time the stipulation was entered, see n. 3, *supra,* but the Tanker Law had gone into effect prior to that time.

susceptibility of Puget Sound to damage from large oil spills and the peculiar navigational problems associated with tanker operations in the Sound.[6] Thus, there is no basis for pre-emption under Title II.[7]

---

[6] The Tanker Law contains the following statement of intent and purpose:

"Because of the danger of spills, the legislature finds that the transportation of crude oil and refined petroleum products by tankers on Puget Sound and adjacent waters creates a great potential hazard to important natural resources of the state and to jobs and incomes dependent on these resources.

"The legislature also recognizes Puget Sound and adjacent waters are a relatively confined salt water environment with irregular shorelines and therefore there is a greater than usual likelihood of long-term damage from any large oil spill.

"The legislature further recognizes that certain areas of Puget Sound and adjacent waters have limited space for maneuvering a large oil tanker and that these waters contain many natural navigational obstacles as well as a high density of commercial and pleasure boat traffic." Wash. Rev. Code § 88.16.170 (Supp. 1975).

The natural navigational hazards in the Sound are compounded by fog, tidal currents, and wind conditions, in addition to the high density of vehicle traffic. App. 69.

Among the "areas . . . [with] limited space for maneuvering a large oil tanker," referred to by the Washington Legislature, is undoubtedly Rosario Strait. The Strait is less than one-half mile wide at its narrowest point, Exh. G, and portions of the shipping route through the Strait have a depth of only 60 feet. App. 65. (A 190,000 DWT tanker has a draft of approximately 61 feet, and a 120,000 DWT tanker has a draft of approximately 52 feet. *Id.*, at 80.)

[7] In addition to finding the Tanker Law's size limit to be inconsistent with the PWSA and federal actions thereunder, the Court suggests that "[t]here is some force to the argument" that the size limit conflicts with the tanker construction program established by the Maritime Administration pursuant to the Merchant Marine Act, 1936. *Ante,* at 179 n. 28. The Court does not rely on this argument, however, and it is totally lacking in factual basis. While it is true that construction of tankers larger than 125,000 DWT has been subsidized under the program, almost two-thirds of the tankers that have been or are being constructed have been smaller than 125,000 DWT, App. 60; of the remainder, the smallest

For similar reasons, I would hold that Washington's size regulation does not violate the Commerce Clause. Since water depth and other navigational conditions vary from port to port, local regulation of tanker access—like pilotage and tug requirements, and other harbor and river regulation—is certainly appropriate, and perhaps even necessary, in the absence of determinative federal action. See, *e. g., Cooley* v. *Board of Wardens,* 12 How. 299, 319 (1852); *Packet Co.* v. *Catlettsburg,* 105 U. S. 559, 562–563 (1882). Appellees have not demonstrated that the Tanker Law's size limit is an irrational or ineffective means of promoting safety and environmental pro-

---

are 225,000 DWT vessels with drafts well in excess of 60 feet—too large to pass through Rosario Strait, see n. 6, *supra,* or dock at any of the refineries on Puget Sound (Atlantic Richfield's refinery at Cherry Point has a dockside depth of 55 feet; none of the other five refineries on Puget Sound has sufficient dockside depth even to accommodate tankers as large as 125,000 DWT. App. 47–48, 80).

Appellees advance one final argument for invalidating the 125,000 DWT size limit under the Supremacy Clause. Relying on the well-established proposition that federal enrollment and licensing of a vessel give it authority to engage in coastwise trade and to navigate in state waters, *Douglas* v. *Seacoast Products, Inc.,* 431 U. S. 265, 276, 280–281 (1977); *Gibbons* v. *Ogden,* 9 Wheat. 1, 212–214 (1824), appellees assert that Washington may not exclude from any of its waters tankers that have been enrolled and licensed, or registered, pursuant to the federal vessel registration, enrollment, and licensing laws, 46 U. S. C. §§ 221, 251, 263. Even assuming that registration of a vessel carries with it the same privileges as enrollment and licensing, this argument ignores a proposition as well established as the one relied on by appellees: Notwithstanding the privileges conferred by the federal vessel license, "States may impose upon federal licensees reasonable, nondiscriminatory conservation and environmental protection measures otherwise within their police power." *Douglas* v. *Seacoast Products, Inc., supra,* at 277; see, *e. g., Huron Portland Cement Co.* v. *Detroit,* 362 U. S. 440 (1960); *Manchester* v. *Massachusetts,* 139 U. S. 240 (1891); *Smith* v. *Maryland,* 18 How. 71 (1855). The Tanker Law's size limitation appears to be a reasonable environmental protection measure, see n. 8, *infra,* and it is imposed evenhandedly against both residents and nonresidents of the State.

tection,[8] nor have they shown that the provision imposes any substantial burden on interstate or foreign commerce.[9] Consequently, it is clear that appellees have not carried their burden of showing that the provision's impact on interstate or foreign commerce "is clearly excessive in relation to the putative local benefits." *Pike* v. *Bruce Church, Inc.,* 397 U. S. 137, 142 (1970).

I do not find any of appellees' other arguments persuasive. I would therefore sustain the size limitation imposed by the Tanker Law.

MR. JUSTICE STEVENS, with whom MR. JUSTICE POWELL joins, concurring in part and dissenting in part.

The federal interest in uniform regulation of commerce on the high seas, reinforced by the Supremacy Clause, "dictates that the federal judgment that a vessel is safe to navigate United States waters prevail over the contrary state judgment." *Ante,* at 165. For that reason, as the Court explains in Part IV of its opinion, we must reject the judgment expressed by the Legislature of the State of Washington that

---

[8] The stipulation quoted by the Court, *ante,* at 176 n. 27, merely establishes that there is good-faith dispute as to whether exclusion of large tankers will in fact reduce the risk of oil spillage in Puget Sound. A showing that there is conflicting evidence is not sufficient to undercut the presumption that a State's police power has been exercised in a rational manner. See, *e. g., Firemen* v. *Chicago, R. I. & P. R. Co.,* 393 U. S. 129, 138–139 (1968).

[9] Exclusion of tankers larger than 125,000 DWT has not resulted in any reduction in the amount of oil processed at the Puget Sound refineries. App. 68. Moreover, according to the record, use of a 120,000 DWT tanker rather than a 150,000 DWT tanker increases the cost of shipping oil from Valdez, Alaska, to Cherry Point by a mere $.02 to $.04 per barrel, *id.,* at 64; and the record does not specify the relevant cost data for the Persian Gulf-Cherry Point route. Finally, appellees offered no concrete evidence of any significant disruption in their tanker operations, or of any decrease in the market value of the tankers that they own, as a result of the Tanker Law's provisions.

an oil tanker of 40,000 to 125,000 deadweight tons cannot safely navigate in Puget Sound unless it possesses the "standard safety features" prescribed by § 88.16.190 (2) of the Washington Code.[1] As the Court holds, the state statute imposing those design requirements is invalid. It follows, I believe, that the State may not impose any special restrictions on vessels which do not satisfy these invalid criteria.

The Court correctly holds that the State may not exclude vessels in that category from Puget Sound but it inconsistently allows the State to impose a costly tug-escort requirement on those vessels and no others. This tug-escort requirement is not, by its terms, a general safety rule from which tankers are exempt if they possess the invalid design features.[2] Quite the

---

[1] Washington Rev. Code § 88.16.190 (2) (Supp. 1975) reads as follows:

"(2) An oil tanker, whether enrolled or registered, of forty to one hundred and twenty-five thousand deadweight tons may proceed beyond the points enumerated in subsection (1) if such tanker possesses all of the following standard safety features:

"(a) Shaft horsepower in the ratio of one horsepower to each two and one-half deadweight tons; and

"(b) Twin screws; and

"(c) Double bottoms, underneath all oil and liquid cargo compartments; and

"(d) Two radars in working order and operating, one of which must be collision avoidance radar; and

"(e) Such other navigational position location systems as may be prescribed from time to time by the board of pilotage commissioners:

"*Provided,* That, if such forty to one hundred and twenty-five thousand deadweight ton tanker is in ballast or is under escort of a tug or tugs with an aggregate shaft horsepower equivalent to five percent of the deadweight tons of that tanker, subsection (2) of this section shall not apply: *Provided further,* That additional tug shaft horsepower equivalencies may be required under certain conditions as established by rule and regulation of the Washington utilities and transportation commission pursuant to chapter 34.04 RCW: *Provided further,* That a tanker of less than forty thousand deadweight tons is not subject to the provisions of [this Act]."

[2] The Court, *ante,* at 173, seems to characterize the tug-escort requirement as such a "general rule."

contrary, the tug-escort requirement is merely a proviso in § 88.16.190 (2)—the section of the Washington Tanker Law that prescribes the design requirements; it is imposed only on tankers that do not comply with those requirements. The federal interest that prohibits state enforcement of those requirements should also prohibit state enforcement of a special penalty for failure to comply with them.

If the federal interest in uniformity is to be vindicated, the magnitude of the special burden imposed by any one State's attempt to penalize noncompliance with its invalid rules is of no consequence. The tug-escort penalty imposed by Washington will cost appellee ARCO approximately $277,500 per year. The significance of that cost cannot be determined simply by comparison with the capital investment which would be involved in complying with Washington's invalid design specifications. Rather, it should be recognized that this initial burden is subject to addition and multiplication by similar action in other States.[3] Moreover, whether or not so multiplied, the imposition of any special restriction impairs the congressional determination to provide uniform standards for vessel design and construction.[4]

---

[3] The possibility of States' enacting legislation similar to Washington's is not remote. Alaska has enacted legislation requiring payment of a "risk charge" by vessels that do not conform to state design requirements, Alaska Stat. Ann. § 30.20.010 et seq. (Sept. 1977), and California is considering comparable legislation. See Brief for State of California et al. as Amici Curiae 3 n. 2.

[4] No matter how small the cost in the individual case, the State's effort here to enforce its general determinations on vessel safety must be viewed as an "obstacle" to the attainment of Congress' objective of providing comprehensive standards for vessel design. See Hines v. Davidowitz, 312 U. S. 52, 67. This does not mean that the State cannot adopt any general rules imposing tug-escort requirements, but it does mean that it cannot condition those requirements on safety determinations that are pre-empted by federal law, thus "impos[ing] additional burdens not contemplated by Congress." De Canas v. Bica, 424 U. S. 351, 358 n. 6.

Since I am persuaded that the tug-escort requirement is an inseparable appendage to the invalid design requirements, the invalidity of one necessarily infects the other. I therefore respectfully dissent from Parts V and VII of the Court's opinion.[5]

---

[5] The validity of Washington's tug-escort provision may be short lived, despite today's opinion. The Secretary is now contemplating regulations in this area, and even the majority concedes that they may pre-empt the State's regulation. *Ante*, at 172. While this lessens the impact of the State's regulation and the threat it poses to the federal scheme, the legal issue is not affected by the imminence of agency action.