**James O. SMITH, III, Plaintiff,**

**v.**

**COMMISSIONER OF the GEORGIA DEPARTMENT OF PUBLIC SAFETY, Defendant.**

**Civ. A. No. 86–90–VAL (WDO).**

United States District Court, M.D. Georgia, Valdosta Division.

Nov. 10, 1987.

Randall A. Schmidt, Valdosta, Ga., John L. Cromarties, Jr., Atlanta, Ga., for plaintiff.

Neal Childers, Atlanta, Ga., for defendant.

OWENS, Chief Judge:

Plaintiff, James O. Smith, III, has brought this 42 U.S.C. § 1983 action seeking declaratory and injunctive relief against defendant, the Commissioner of the Georgia Department of Public Safety (hereinafter "Commissioner"). In his complaint, plaintiff asserts that the Commissioner has deprived him of his property, specifically, his State of Georgia driver's license, without the due process guaranteed to him by the Fourteenth Amendment to the Constitution of the United States. Jurisdiction in this matter is based upon 28 U.S.C. § 1343(3) (1979) and 28 U.S.C. § 1331 (1980). The parties have agreed to have this case decided by the court, and, therefore, have waived any right to a trial by jury that they might have otherwise had in this action. *See* Summary of Telephonic conference dated July 22, 1987. The parties have also submitted all evidence that they wish to be considered, and this case is now ready to be decided. The facts of this controversy are relatively undisputed.

### Factual Background

Mr. Smith is a thirty-nine (39) year old male citizen of the United States who resides in Lowndes County, Georgia. *See*

Exhibit A, ¶¶ 1–2, which is attached to the proposed consolidated pre-trial order. In May of 1982, Mr. Smith was issued a Georgia driver's license in accordance with O.C. G.A. § 40–5–36 (1985). Exhibit A, at ¶ 7. Prior to the expiration of that license, on May 18, 1985, Mr. Smith was involved in an accident in his automobile. *Id.* at ¶ 8. At the time of this accident, Mr. Smith was a member of the Georgia National Guard. *Id.* at ¶ 9.

Following this accident, on May 21, 1985, Sergeant Allen Catoe of the Valdosta Police Department sent a letter to the Georgia Department of Public Safety (GDPS). In that letter Sergeant Catoe informed the GDPS of certain alleged driving incidents involving Mr. Smith. Sergeant Catoe expressed concern over Mr. Smith's driving ability and sought to have the GDPS revoke his license. *See* Exhibit II. After receiving this information, the GDPS sent Mr. Smith a notice of revocation. *See* Exhibit III.

Upon receiving this notice, Mr. Smith timely requested a hearing before the GDPS, and the revocation was stayed pending the resolution of this hearing. *See* Exhibit A, ¶ 12. A hearing was held on June 25, 1985, before Sergeant M.W. Clements, who is a member of the uniform division of the GDPS specially trained to handle such hearings. At that hearing, Mr. Smith was not permitted to subpoena witnesses to appear at the hearing, nor was he permitted to examine or otherwise discover the evidence against him. *Id.* at ¶¶ 15–16, 22. It was only after the filing of the instant lawsuit that Mr. Smith was finally able to discover the evidence against him and the source of that information.

At the conclusion of the GDPS hearing, the hearing officer, relying on the undisclosed "confidential" information contained in Officer Catoe's letter, revoked Mr. Smith's driver's license. He further advised Mr. Smith that should he get a physician to file a complete medical report, GDPS Form 287, the GDPS Medical Review Board would review his case. *Id.* at ¶ 19; and Exhibit VI. Mr. Smith did not get a physician to complete this form. He did, however, subsequent to the institution of this action, submit a sworn affidavit to the Board in lieu of a completed GDPS Form 287. *See* Exhibit VIII; and Exhibit A, ¶¶ 21, 25. Because the proper medical reports were not submitted to the Medical Advisory Board, a review of the GDPS hearing officer's decision was not made, and that decision was, thereby, affirmed. Mr. Smith did not seek to have this decision reviewed by any state court forum. On October 4, 1985, the GDPS informed Mr. Smith that his license had been revoked as a result of the hearing officer's decision in his case. *See* Exhibit VII.

### Due Process Requirements

■ Mr. Smith asserts that the statutory procedure utilized by Georgia to suspend or revoke the licenses of drivers who are alleged to be medically unfit to drive does not meet the requirements of the Fourteenth Amendment to the Constitution. Mr. Smith further contends that as a result of those procedures, he was unconstitutionally deprived of his license, even though he remains fit to drive. From the outset, the court finds that the interest of the holder of a driver's license in keeping that license is one that is protected by due process. *See Bell v. Burson*, 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971). This is true regardless of whether the state denominates the issuance of their licenses as a "privilege" or a "right." *Id.* at 539, 91 S.Ct. at 1589. Once a driver's license has been issued, the license itself often becomes essential to the holder's livelihood, and, therefore, the suspension of that license potentially infringes upon these important interests. *Id.* The protection of the Fourteenth Amendment is, thus, implicated. *Id.*

In protecting these interests, the Supreme Court in *Bell* has held that when a state seeks to terminate an interest such as a driver's license, it must afford "notice and opportunity for hearing appropriate to the nature of the case" *before* the termination becomes effective. *Id.* at 542, 91 S.Ct. at 1591. Absent an "emergency situation," a pre-revocation hearing is required. *Id.* Defendant has not asserted that such

an emergency situation existed in this case, and, given the fact that the Commissioner voluntarily stayed its revocation decision pending the decision by the GDPS hearing officer, the court finds that such a position would be untenable. *Tolbert v. McGriff,* 434 F.Supp. 682, 685 n. 8 (M.D.Ala.1976).[1]

In order for the revocation of Mr. Smith's license to have been proper then, the Commissioner was required to give him notice and an opportunity for a hearing prior to the effective date of the termination of his license.

A. The effective date of the termination.

On May 24, 1985, Mr. Smith was sent notice that his license was to be revoked as of June 10, 1985. This revocation, however, was stayed pending the resolution of Mr. Smith's administrative remedies. The court, therefore, finds that the effective date of the termination occurred sometime after the hearing was provided to Mr. Smith by the GDPS. The issue before the court, thus, becomes whether the notice and hearing provided Mr. Smith were adequate under the Fourteenth Amendment.

B. Notice

Notice requires that the licensee be told the precise nature of the pending or threatened action. *Smith v. McGriff,* 434 F.Supp. 673, 679 (M.D.Ala.1976). It also requires that adequate time be provided the licensee between the giving of notice and the hearing so that the licensee may have sufficient time to confront the evidence against him. *Id.* Exhibits III and

IV constitute the notice given Mr. Smith prior to his hearing with the GDPS officer. A review of these documents leads the court to conclude that the notice given, while adequate with regard to the time limits it provided, was inadequate in informing Mr. Smith of what rights he would have at the hearing, and it further failed to inform him of the nature of the evidence against him. At minimum, the court believes the following elements must be included in the notice given if it is to pass constitutional muster:

(1) A statement of the time, place, and nature of the hearing;

(2) A statement of the legal authority and jurisdiction under which the hearing is to be held;

(3) A reference to the particular section of the statutes and rules involved;

(4) A short and plain statement of the matters asserted. If the Department is unable to state the matters in detail at that time, the notice may be limited to a statement of the issues involved. Thereafter, upon application, a more definite and detailed statement shall be furnished; and

(5) A statement as to the right of any party to subpoena witnesses and documentary evidence through the agency. *See* O.C.G.A. § 50–13–13 (1986) for similar notice requirements. Absent this type of notice, the court must find that the notice given Mr. Smith did not comply with the requirements of the due process clause.

C. Hearing

While the formality and procedural requisites of a hearing can vary, *Boddie v.*

1. It appears to the court that the state has expressly found that such an emergency situation did not exist since it failed to utilize its own procedures that it has promulgated to deal with a true emergency situation. On this issue, Georgia Administrate Comp. Chapter 570–17–.08(11) provides:

> If the Department finds that the public health, safety or welfare imperatively requires emergency action, and incorporates a finding to that effect in its order, it shall be authorized to issue an emergency order directing immediate revocation of the driver's license. Such emergency order shall be sent to the licensee by certified mail with return receipt requested, or by personal delivery, and shall

> be accompanied by medical report forms and instructions as provided in paragraph (3)(c). The emergency order shall inform the licensee that the revocation of his license shall be effective pending processing of his medical reports or until a hearing is held, if requested, by licensee upon return of his medical reports. A request for a hearing under this emergency provision shall be treated as a request under paragraph (7), and the Board shall expedite its processing in order that a hearing shall be held within 15 days of the request. This hearing shall be a final hearing and shall follow procedures set forth in paragraphs (8), (9), and (10) above.

*Connecticut,* 401 U.S. 371, 378, 91 S.Ct. 780, 786, 28 L.Ed.2d 113 (1971), the hearing itself must be "meaningful," *Armstrong v. Manzo,* 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965), and "appropriate to the nature of the case." *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 313, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950). In other words, the process due will vary in each case depending upon what type of interest is being threatened. *Bell,* 402 U.S. at 540, 91 S.Ct. at 1590. In this instance, the ability to drive on the public roads of this state is clearly an important interest, as is plaintiff's interest in not being unfairly labeled by the state as having certain mental or physical disabilities. Even though Mr. Smith may not be entitled to the same process that he must be afforded, for example, in a felony prosecution, the court is persuaded that the procedural process utilized by the state in this case cannot withstand constitutional scrutiny.

At minimum, the due process requirement of a hearing "embraces not only the right to present evidence but also a reasonable opportunity to know the claims of the opposing party and to meet them." *See Morgan v. United States,* 304 U.S. 1, 18, 58 S.Ct. 773, 776, 82 L.Ed. 1129 (1937); and *Tolbert,* 434 F.Supp. at 686. In *Bell,* the Supreme Court cited to its decision in *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), for the proper standard of due process applicable to driver's license cases. *Bell,* 402 U.S. at 539, 541, and 542, 91 S.Ct. at 1589, 1590, and 1591. In *Goldberg,* the Supreme Court held that "[i]n almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses." 397 U.S. at 269, 90 S.Ct. at 1021. Quoting from prior precedent, the Supreme Court in *Goldberg* went on to state that:

> Certain principles have remained relatively immutable in our jurisprudence. One of these is that where governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed to the individual so that he has the opportunity to show that it is untrue.

397 U.S. at 270, 90 S.Ct. at 1021 (quoting from *Greene v. McElroy,* 360 U.S. 474, 496, 79 S.Ct. 1400, 1413, 3 L.Ed.2d 1377 (1959)). Applying this law to the evidence presented, it is evident to the court that these minimum safeguards have not been met in this case.

At the hearing before the GDPS officer, Mr. Smith was not given an opportunity to rebut any of the evidence against him due to the fact that he was never apprised of the nature of that evidence. Furthermore, the evidence presented was not from live witnesses, rather, it was in the form of hearsay statements that were, by nature, not subject to cross-examination by Mr. Smith. Finally, even the statutory procedural process that is required to be provided under Georgia law did not afford Mr. Smith any opportunity to properly confront the evidence against him. The applicable statute provides that the hearing held "shall be administrative in nature and kept on an informal basis, therefore, no transcript of record shall be made nor witnesses subpoenaed. The reviewing officer shall consider statements of witnesses, oral or in writing, and any other relevant and trustworthy information." *See* Ga.Admin. Comp. Ch. 570–17–.09(8). By statute then, Mr. Smith was legislatively barred from confronting and cross-examining witnesses adverse to his interest of maintaining his driver's license. The use of this "investigative" procedure, as opposed to an "adjudicative" process whereby evidence is tested in an adversary proceeding before an independent hearing officer, simply does not provide sufficient safeguards to ensure that a fair and nonarbitrary decision will be rendered in these types of cases. It has long been recognized that "fairness can rarely be obtained by secret, one-sided determination of facts decisive of rights ... [and n]o better instrument has been devised for arriving at truth than to give a person in jeopardy of serious loss notice of the case against him and opportunity to meet it." *See Joint Anti–Fascist Refugee Committee v. McGrath,* 341 U.S. 123, 170–

72, 71 S.Ct. 624, 647–49, 95 L.Ed. 817 (Frankfurter, J., concurring) (1951). Absent a process whereby a licensee is given an opportunity to refute any and all evidence that is to be considered by the designated hearing officer, the licensee simply has not been accorded the adjudicative process required by the Constitution. *Smith*, 434 F.Supp. at 679–80; and *Tolbert*, 434 F.Supp. at 685–86. Accordingly, the court must hold that the revocation of Mr. Smith's driver's license in this case was in violation of his constitutional right to due process of law because the hearing provided to him by GDPS did not allow Mr. Smith to confront and cross-examine the evidence and witnesses in the case.

### Adequate State Law Remedy

■ The Commissioner asserts that even assuming, arguendo, that the administrative hearing provided Mr. Smith did not satisfy the requirements of the Constitution, the availability of a *de novo* review by the state court system remedies any inadequacies inherent in the administrative hearing process. The flaw in the Commissioner's argument is, however, that the revocation becomes effective prior to the state court adjudication. O.C.G.A. § 40–5–66 (1985), provides that an aggrieved licensee has the right to appeal from any agency decision to the state court system, and that the hearing on the appeal shall be *de novo*.[2] This same section further provides, however, that the appeal shall not "act as a supersedeas of any orders or acts of the department," nor shall the licensee "be allowed to operate any vehicle in violation of any suspension or revocation by the department while any such appeal is pending." See O.C.G.A. § 40–5–66 (1985). This right

of appeal, therefore, does not afford a licensee the required pre-revocation hearing mandated by the Fourteenth Amendment. In addition, unlike the situation in *Tolbert*, there is no evidence in the record that, as a matter of common practice, the GDPS routinely grants a stay of its revocation orders pending the outcome of the state court adjudication. Without this type of evidence, the court cannot find that the right to appeal to the state court system rectifies the procedural flaws already found in the GDPS hearing process.

### Res Judicata and Collateral Estoppel

■ Next, the Commissioner asserts that the doctrines of res judicata and collateral estoppel bar Mr. Smith from litigating the issues in this case because they have already been litigated and decided by the administrative hearing process before the GDPS, which Mr. Smith did not appeal. While it is not absolutely certain when issue or claim preclusion will be allowed as a result of a parties' failure to appeal a finding by a state administrative agency, it is clear that, under the facts of this case, issue preclusion is simply not available as a defense to the Commissioner. Before a finding by a state administrative agency can potentially, at least, be given preclusive effect, the court must first find that the parties to that proceeding were given an adequate opportunity to litigate the issues involved therein. *University of Tennessee v. Elliot*, —— U.S. ——, 106 S.Ct. 3220, 3225–26, 92 L.Ed.2d 635, 645–46 (1986). This court cannot find that Mr. Smith had a full opportunity to litigate the issues in this case if he was not given an opportunity to confront the evidence against him and to

---

**2.** O.C.G.A. section 40–5–66 reads:

Except as provided in subsection (e) of Code Section 40–5–55 and subsection (h) of Code Section 40–5–64, any decision rendered by the department shall be final unless the aggrieved person shall desire an appeal. In such case, such person shall have the right to enter an appeal in the superior court of the county of his residence or in the Superior Court of Fulton County. Such appeal shall name the commissioner as defendant and must be filed within 30 days from the date the department enters its decision or order. The

person filing the appeal shall not be required to post any bond nor to pay the costs in advance.

If the person so desires, the appeal may be heard by the judge at term or in chambers or by a jury at the first term. The hearing on the appeal shall be de novo, but no appeal shall act as a supersedeas of any orders or acts of the department. No person shall be allowed to operate any vehicle in violation of any suspension or revocation by the department while any such appeal is pending.

cross-examine the state's witnesses. *See Delgado v. Lockheed–Georgia Co.,* 815 F.2d 641, 646–47 (11th Cir.1987); and *City of Pompano Beach v. FAA,* 774 F.2d 1529, 1538 n. 10 (11th Cir.1985). Because Mr. Smith was not afforded these safeguards, the finding by the GDPS hearing officer that Mr. Smith was not medically fit to drive is of no effect in these proceedings.

### Failure to Exhaust State Remedies

■ The Commissioner further asserts that Mr. Smith has failed to avail himself of the administrative and judicial remedies available under state law that would allow for the reinstatement of his license. As to the failure to seek administrative review by the Medical Review Board and later judicial review of the final decision made by the GDPS hearing officer, the court finds that where, as in this case, the practice and policy of the state is clearly in violation of plaintiff's constitutional rights, 42 U.S.C. § 1983 would not require exhaustion of state remedies. Especially, if the procedures themselves are the source of the constitutional violation. *See Patsy v. Florida Board of Regents,* 457 U.S. 496, 516, 102 S.Ct. 2557, 2568, 73 L.Ed.2d 172 (1982); and *Grandison v. Smith,* 779 F.2d 637, 642 (11th Cir.1985).

### Sovereign Immunity

■ The final defense raised by the Commissioner is that the doctrine of sovereign immunity under the Eleventh Amendment bars the relief requested by Mr. Smith. The court finds it inexplicable that such an argument would be raised by the Commissioner given the state of the law on this question. The Eleventh Amendment confirms "that the fundamental principal of sovereign immunity limits the grant of judicial authority in Art. III." *Green v. Mansour,* 474 U.S. 64, 68, 106 S.Ct. 423, 425, 88 L.Ed.2d 371, 377 (1985). As a general matter, then, a federal court has no direct judicial power over a state. There are, however, certain well established exceptions to the reach of the Eleventh Amendment. *Atascadero State Hospital v. Scanlon,* 473 U.S. 234, 237–38, 105 S.Ct. 3142, 3145, 87 L.Ed.2d 171, 177, *reh'g denied,* 473 U.S. 926, 106 S.Ct. 18, 87 L.Ed.2d 696 (1985).

The exception directly applicable to this case stems from the Supreme Court's decision in *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). From that case the Supreme Court has found that state officials who have violated constitutional or statutory federal law may be sued in federal court for prospective injunctive relief. *Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89, 101, 104 S.Ct. 900, 908, 79 L.Ed.2d 67 (1984). If federal law has been violated in the past and continues to be violated, this court may grant prospective injunctive relief to halt the continuing violation. *Green,* 474 U.S. at 68, 106 S.Ct. at 425, 88 L.Ed.2d at 377. Simply put, official-capacity actions for prospective relief from unconstitutional state policies or customs are not treated as actions against the state for purposes of the Eleventh Amendment, *Kentucky v. Graham,* 473 U.S. 159, 163 n. 6, 105 S.Ct. 3099, 3104 n. 6, 87 L.Ed.2d 114, 122 n. 6 (1985), and it is, therefore, not a defense in this case. *See also Ray v. Atlantic Richfield Co.,* 435 U.S. 151, 156–57 n. 6, 98 S.Ct. 988, 994 n. 6, 55 L.Ed.2d 179 (1978).

### What Type of Procedure is Required

■ This court cannot require the state to adopt any one type of procedure to use in these revocation proceedings, however, the court does believe that it should indicate what type of procedure would satisfy the due process clause. There are at least two approaches that defendants can take in these cases. One approach would be to stay the effect of the revocation order while the *de novo* appeal in the state court is pending. A second approach would be to institute a hearing process that comports with due process safeguards at the administrative level. Using this approach, a driver must be apprised of the charges against him and the implications of those charges, and he must further be given an opportunity to request a hearing on the matter at which time he or she may present evidence, call and cross-examine witnesses, and confront the evidence against him. The sus-

pension must be stayed pending this hearing. The licensee should also be informed of the medical and Department standards under which he or she is to be evaluated. *See Hornsby v. Allen*, 326 F.2d 605 (5th Cir.1964). If after the hearing the hearing officer believes the licensee is incompetent to drive, he may suspend the license upon a finding based on the evidence and the Department's standards. The hearing officer must then immediately inform the licensee of any appeals that are available. Once the administrative hearing has been completed, the GDPS would be authorized to make effective the revocation order. *Smith*, 434 F.Supp. at 680. The state, of course, may still provide for a *de novo* review of the GDPS's decision, however, a stay of the revocation order would not be required during the pendency of these proceedings because the licensee would already have been provided his constitutionally mandated hearing.

 Finally, if an appropriate official of the GDPS finds that a genuine "emergency situation" exists such that the general public is in imminent danger of being harmed by the licensee if he is allowed to continue to drive, the GDPS officer may temporarily suspend that person's driver's license without a hearing. The licensee under these circumstances would then be entitled to an immediate post-revocation hearing on the matter that complies with all due process requirements as previously discussed. The court emphasizes, however, that while the decision in *Bell* did not explain what circumstances would constitute an "emergency situation," the Supreme Court in *Fuentes v. Shevin*, 407 U.S. 67, 90–91, 92 S.Ct. 1983, 1999–2000, 32 L.Ed.2d 556 (1972) indicated that the situations would have to be "truly unusual" ones, "extraordinary" ones, such as those in which earlier courts have allowed pre-hearing seizures.[3]

### Conclusion

This court recognizes that the State of Georgia clearly has an interest in keeping persons that are medically unfit to drive off the public roads of the state. Yet, it also has a duty to insure that a driver is not deprived of his license without due process of law. Because this court finds that the state's revocation procedure for persons believed to be medically unfit does not provide this due process of law and is, therefore, unconstitutional, this court ENJOINS the Commissioner, his successors and agents from utilizing this or any other procedure that does not provide the holder of a driver's license with a pre-deprivation hearing that comports with due process requirements. Only in the rare situation that a truly "emergency situation" exists would a pre-hearing deprivation be allowed. Furthermore, since Mr. Smith was deprived of his license as a result of this unconstitutional procedure, the court also ENJOINS the Commissioner, his successors and agents from interfering with Mr. Smith's driving privileges until such time as he has been given a proper hearing on the question of whether he is medically fit to drive. Finally, the court would like to stress, however, that its decision today in no way reflects a judgment on the question of whether, in fact, Mr. Smith is medically unfit to drive. That question must be determined at a later date.

---

3. The cases cited by the Supreme Court were: *Ewing v. Mytinger & Casselberry, Inc.*, 339 U.S. 594, 70 S.Ct. 870, 94 L.Ed. 1088 (1950) (protect public from misbranded drugs); *Fahey v. Mallonee*, 332 U.S. 245, 67 S.Ct. 1552, 91 L.Ed. 2030 (1947) (protect against a bank failure); *Phillips v. Comm'er*, 283 U.S. 589, 51 S.Ct. 608, 75 L.Ed. 1289 (1931) (collect taxes); *Central Union Trust Co. v. Garvan*, 254 U.S. 554, 41 S.Ct. 214, 65 L.Ed. 403 (1921) (meet the needs of the war effort); and *North American Storage Co. v. Chicago*, 211 U.S. 306, 29 S.Ct. 101, 53 L.Ed. 195 (1908) (protect public from contaminated foods).