**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

TRANSPORTATION DIVISION OF THE
INTERNATIONAL ASSOCIATION OF
SHEET METAL, AIR, RAIL, AND
TRANSPORTATION WORKERS;
BROTHERHOOD OF LOCOMOTIVE
ENGINEERS AND TRAINMEN,
*Petitioners*,

v.

FEDERAL RAILROAD
ADMINISTRATION; U.S. DEPARTMENT
OF TRANSPORTATION,
*Respondents*,

ASSOCIATION OF AMERICAN
RAILROADS,
*Intervenor.*

No. 19-71787

FRA No.
FRA-2014-0033

CALIFORNIA PUBLIC UTILITIES
COMMISSION,

*Petitioner*,

v.

PETE BUTTIGIEG, Secretary of
Transportation; U.S. DEPARTMENT
OF TRANSPORTATION; RONALD L.
BATORY, Administrator of the
Federal Railroad Administration;
FEDERAL RAILROAD
ADMINISTRATION,

*Respondents*,

ASSOCIATION OF AMERICAN
RAILROADS,

*Intervenor.*

No. 19-71802

FRA No.
FRA-2014-0033

On Petition for Review of an Order of the
Federal Railroad Administration

| | |
|---|---|
| STATE OF WASHINGTON,<br>*Petitioner*,<br><br>v.<br><br>U.S. DEPARTMENT OF<br>TRANSPORTATION; FEDERAL<br>RAILROAD ADMINISTRATION,<br>*Respondents*,<br><br>ASSOCIATION OF AMERICAN<br>RAILROADS,<br>*Intervenor*. | No. 19-71916<br><br>TRAN No.<br>FRA-2014-0033 |

| | |
|---|---|
| STATE OF NEVADA,<br>*Petitioner*,<br><br>v.<br><br>PETE BUTTIGIEG, Secretary of<br>Transportation; U.S. DEPARTMENT<br>OF TRANSPORTATION; RONALD L.<br>BATORY, Administrator of the<br>Federal Railroad Administration;<br>FEDERAL RAILROAD<br>ADMINISTRATION,<br>*Respondents*,<br><br>ASSOCIATION OF AMERICAN<br>RAILROADS,<br>*Intervenor*. | No. 19-71918<br><br>TRAN No.<br>FRA-2014-0033<br><br>OPINION |

On Petition for Review of an Order of the
Department of Transportation

Argued and Submitted October 5, 2020
Seattle, Washington

Filed February 23, 2021

Before:  Consuelo M. Callahan and Morgan Christen,
Circuit Judges, and Jed S. Rakoff,[*] District Judge.

Opinion by Judge Callahan;
Concurrence by Judge Christen

## SUMMARY[**]

### Federal Railroad Administration

The panel dismissed a petition for review filed by two unions; granted petitions filed by California, Washington, and Nevada; vacated the Federal Railroad Administration ("FRA")'s Order, 84 Fed. Reg. 24,735, purporting to adopt a nationwide maximum one-person crew rule and to preempt any state laws concerning that subject matter; and remanded to the FRA.

---

[*] The Honorable Jed S. Rakoff, United States District Judge for the Southern District of New York, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

As a threshold matter, the panel addressed arguments concerning jurisdiction raised by the intervenor Association of American Railroads.  First, the panel dismissed the Unions' petition because venue was not proper under 28 U.S.C. § 2343 where the Unions' principal offices were not in the Ninth Circuit.  Second, the panel held that there was jurisdiction over the petitions filed by the States because all three States were sufficiently aggrieved to invoke jurisdiction under 28 U.S.C. § 2344.

The panel held that the Order did not implicitly preempt state safety rules.

Turning to the merits, the panel held that the FRA failed to comply with the Administrative Procedures Act ("APA")'s minimum notice-and-comment provisions in issuing the Order.  Specifically, the panel held that there was nothing in the FRA's March 2016 Notice of Proposed Rulemaking ("NPRM") (proposing a national minimum requirement of two member crews for trains) to put a person on notice that the FRA might adopt a national one-person crew limit.

Finally, the panel held, on this record, that the Order was arbitrary and capricious, and must be vacated.  Specifically, the panel held that the Order's basis for its action – that two-member crews were less safe than one-person crews – did not withstand scrutiny.  Also, the panel held that the FRA's contemporaneous explanation – that indirect safety connections might be achieved with fewer than two crew members – was lacking.  Despite the deference due FRA decisions, the panel concluded that the States met their burden of showing that the issuance of the Order violated the APA.

Judge Christen concurred, and joined parts I, II, III, and IV.C of the opinion.  She would vacate the notice of withdrawal solely based on the conclusion that the Notice of Proposed Rulemaking did not provide adequate notice or opportunity to comment.  She would not reach whether the notice of withdrawal negatively preempted state laws or whether the FRA provided a satisfactory explanation for the notice.

## COUNSEL

Kristin Beneski (argued) and Harry Fukano, Assistant Attorneys General; Robert W. Ferguson, Attorney General; Office of the Attorney General, Seattle, Washington; Arocles Aguilar, General Counsel; Christine J. Hammond, Enrique Gallardo, and Vanessa Baldwin, California Public Utilities Commission, San Francisco, California; for Petitioners State of Washington and California Public Utilities Commission.

Kevin C. Brodar (argued), General Counsel, SMART-TD, North Olmsted, Ohio; Lawrence M. Mann, Alper & Mann P.C., Bethesda, Maryland; Michael S. Wolly, Michael S. Wolly PLLC, Washington, D.C.; Joshua D. McInerney BLET, Barkan Meizlish LLP, Columbus, Ohio; for Petitioners Transportation Division of the International Association of Sheet Metal, Air, Rail, and Transportation Workers, and Brotherhood of Locomotive Engineers and Trainmen.

Aaron D. Ford, Attorney General; Gregory L. Zunino, Deputy Solicitor General; Brandee Mooneyhan, Deputy Attorney General; Office of the Attorney General, Carson City, Nevada; Jill C. Davis, Assistant General Counsel,

Public Utilities Commission, Carson City, Nevada; for Petitioner State of Nevada.

Martin Totaro and Abby C. Wright, Appellate Staff; Joseph H. Hunt, Assistant Attorney General; Civil Division, United States Department of Justice, Washington, D.C.; Steven G. Bradbury, General Counsel; Paul M. Geier, Assistant General Counsel for Litigation and Enforcement; Joy K. Park, Senior Trial Attorney; Brett A. Jortland, Acting Chief Counsel; Rebecca S. Behravesh, Senior Attorney; Federal Railroad Administration, Washington, D.C.; for Respondents.

Thomas H. Dupree, Jr. and Jacob T. Spencer, Gibson Dunn & Crutcher LLP, Washington, D.C.; Kathryn D. Kirmayer and Joseph St. Peter, Association of American Railroads, Washington, D.C.; for Intervenor Association of American Railroads.

Kwame Raoul, Attorney General; Jane Elinor Notz, Solicitor General; Sarah A. Hunger, Deputy Solicitor General; Christian Arizmendi, Assistant Attorney General; Office of the Attorney General, Chicago, Illinois; Xavier Becerra, Attorney General, Sacramento, California; Phil Weiser, Attorney General, Denver, Colorado; Kathleen Jennings, Attorney General, Wilmington, Delaware; Karl A. Racine, Attorney General, Washington, D.C.; Maura Healey, Attorney General, Boston, Massachusetts; Keith Ellison, Attorney General, St. Paul, Minnesota; Jim Hood, Attorney General, Jackson, Mississippi; Gurbir S. Grewal, Attorney General, Trenton, New Jersey; Letitia James, Attorney General, New York, New York; Ellen F. Rosenblum, Attorney General, Salem, Oregon; Mark R. Herring, Attorney General, Richmond, Virginia; Joshua L. Kaul, Attorney General, Madison, Wisconsin; for Amici Curiae

Illinois, California, Colorado, Delaware, District of Columbia, Massachusetts, Minnesota, Mississippi, New Jersey, New York, Oregon, Virginia, and Wisconsin.

William A. Mullins, Baker & Miller PLLC, Washington, D.C.; Sarah G. Yurasko, General Counsel, American Short Line and Regional Railroad Association, Washington, D.C.; for Amicus Curiae American Short Line and Regional Railroad Association.

---

**OPINION**

CALLAHAN, Circuit Judge:

In March 2016, the Federal Railroad Administration (FRA) issued a Notice of Proposed Rulemaking (NPRM) proposing a national minimum requirement of two crew members for trains. Over three years later, on May 29, 2019, the FRA issued an order purporting to adopt a nationwide maximum one-person crew rule and to preempt "any state laws concerning that subject matter." 84 Fed. Reg. 24,735 (the Order). Two Unions[1] and three states, Washington, California,[2] and Nevada (collectively referred to as the States), challenge the Order under the Administrative Procedure Act (APA). We hold that the Order does not implicitly preempt state safety rules, that the FRA failed to comply with the APA's notice-and-comment provisions in

---

[1] The petition for review was filed by the International Association of Sheet Metal, Air, Rail, and Transportation Workers and the Brotherhood of Locomotive Engineers and Trainmen (collectively referred to as the Unions).

[2] The petition was actually filed by the California Public Utilities Commission (California PUC).

issuing the Order, and that the Order is arbitrary and capricious.  We dismiss the Unions' petition for review but grant the States' petitions and vacate the Order.

# I

The Safety Act empowers the Secretary of Transportation to "prescribe regulations and issue orders" addressing railroad safety.  49 U.S.C. § 20103(a).  The Secretary has delegated that authority to the FRA, an agency within the Department of Transportation.  *See* 49 C.F.R. § 1.89(a).  However, the Safety Act also provides that states may adopt or continue in force laws and regulations related to railroad safety, even under certain conditions when they are more "stringent" than the FRA's rules.  49 U.S.C. § 20106(a)(2).

Following two major railroad accidents in 2013 at Lac-Mégantic, Quebec, and Casselton, North Dakota, the FRA asked the Rail Safety Advisory Committee (RSAC) to review whether train crew staffing affected railroad safety. The RSAC included representatives from all the major players concerning railroads, including railroads, labor organizations, suppliers, manufacturers, and the California PUC.  The RSAC appointed a Working Group.  At its first meeting, the FRA noted that it was concerned with railroad safety, that safety was enhanced through redundancy, and that the agency's safety regulations were written with at least a two-person crew in mind.

The Working Group was unable to reach a consensus. Accordingly, consideration of the appropriate crew size was submitted to the FRA for formal rulemaking.  On March 15, 2016, the FRA issued an NPRM.  81 Fed. Reg. 13,918 (March 15, 2016).  The first three sentences of the summary of the NPRM read:

> FRA proposes regulations establishing minimum requirements for the size of train crew staffs depending on the type of operation. *A minimum requirement of two crewmembers is proposed for all railroad operations*, with exceptions proposed for those operations that FRA believes do not pose significant safety risks to railroad employees, the general public, and the environment by using fewer than two-person crews. This proposed rule would also establish minimum requirements for the roles and responsibilities of the second train crew member on a moving train, and promote safe and effective teamwork.

*Id*. (emphasis added).

A public hearing on the NPRM was held on July 15, 2016, and the comment period was extended to August 15, 2016. The States assert that most commenters supported "some kind of train crew staffing requirements." No further action was taken until the FRA issued the Order on May 29, 2019. 84 Fed. Reg. 24,735.

## II

The Order's summary states that the FRA "withdraws the March 15, 2016 NPRM concerning train crew staffing," but adds that "[i]n withdrawing the NPRM, FRA is providing notice of its affirmative decision that no regulation of train crew staffing is necessary or appropriate for railroad operations to be conducted safely at this time." *Id*.

The Order relates that the FRA had "hoped [the] RSAC would provide useful analysis, including conclusive data

addressing whether there is a safety benefit or detriment from crew redundancy (*i.e.*, multiple-person train crews)." *Id*. However, the RSAC was unable to reach consensus and the FRA issued the NPRM. The Order confirms that 1,545 out of nearly 1,600 comments supported some kind of multiple crew staffing requirement. *Id*. at 24,736. Those comments supporting staffing requirements came from individuals, a variety of government officials and organizations, and state and local governments. *Id*. They raised four main points: "(1) [a] train crew's duties are too demanding for one person; (2) new technology will make the job more complex; (3) unpredictable scheduling makes fatigue a greater factor when there is only a one-person crew; and (4) the idea of a one-person train crew is seemingly in conflict with the statutory and regulatory requirements for certification of both locomotive engineers and conductors." *Id*.

The Order notes that the proposal to adopt a minimum two-person crew rule was opposed primarily by railroads and railroad associations. *Id*. at. 24,737. The Order states that studies funded by the Association of American Railroads (AAR) "concluded that safety data analysis show single-person crew operations appear as safe as multiple-person crew operations, if not safer." *Id*. One study "concluded that the proposed rule would greatly reduce U.S. railroads' ability to control operating costs, without making the industry safer." *Id*. A second study funded by the AAR found that "European rail operations are comparable to U.S. rail operations and therefore the success of the European network in implementing single-person crew operations can serve as a model for the U.S. rail system." *Id*.

The Order finds that there "is no direct safety connection between train crew staffing and the Lac-Mégantic or

Casselton accidents." *Id*. It notes that the "FRA does not have information that suggests that there have been any previous accidents involving one-person crew operations that could have been avoided by adding a second crewmember." *Id*. at 24,738 (quoting 81 Fed. Reg. at 13,921). The Order further reasons that although there were "some indirect connections between crew staffing and railroad safety with respect to . . . the accidents, those connections are tangential at best and do not provide a sufficient basis for FRA regulation of train crew staffing requirements."[3] *Id*.

The Order states that the FRA's safety data "does not establish that one-person operations are less safe than multi-person train crews," that "existing one-person operations 'have not yet raised serious safety concerns,'" and that "it is

---

[3] Reviewing the Casselton accident, the FRA commented that it:

> believes that the same type of positive post-accident mitigating actions were achievable with: (1) [f]ewer than two crewmembers on the BNSF grain train involved in the accident, and (2) a well-planned, post-accident protocol that quickly brings railroad employees to the scene of an accident. In other words, the facts of the accident suggest that BNSF could have duplicated the mitigating moves of the grain train crew with responding emergency crewmembers. While FRA acknowledges the BSNF key train crew performed well, potentially saving each other's lives, it is possible that one properly trained crewmember, technology, and/or additional railroad emergency planning could have achieved similar mitigating actions. Thus, the indirect safety connections cited in the NPRM do not proved a sufficient basis for FRA regulation of train crew staffing.

*Id*. at 24,738.

possible that one-person crews have contributed to the [railroads'] improving safety record." *Id*. at 24,739 (quoting 81 Fed. Reg. at 13,950 and 13,932 (alteration in original)). The FRA asserts that data collected over a 17-year period did not allow it to "determine that any of the accidents/incidents involving a one-person crew would have been prevented by having multiple crewmembers." *Id*. The Order states that the reports to the Working Group "identify safety issues that railroads should consider when evaluating any reduction in the number of train crewmembers or a shift in responsibilities among those crewmembers" but "do not indicate that one-person crew operations are less safe and therefore do not form a sufficient basis for a final rule on crew staffing." *Id*. at 24,740.

The Order notes that the received comments "do not provide conclusive "data suggesting that . . . any previous accidents involving one-person crew operations . . . could have been avoided by adding a second crewmember." *Id*. Although "the comments note[d] some indirect connections between crew staffing and railroad safety, such as post-accident response or handling of disabled trains," the FRA believes that "the indirect safety connections cited in the comments could be achieved with fewer than two crewmembers with a well-planned, disabled-train/post-accident protocol."[4]  *Id*.

---

[4] This section of the Order concludes with the following paragraph:

> FRA also does not concur with commenters who assert that the idea of a one-person train crew is seemingly in conflict with the statutory and regulatory requirements for certification of both locomotive engineers and conductors.   There are no specific statutes or regulations prohibiting a one-person train crew, nor is

The Order next observes that railroads are moving away from traditional systems and that "the integration of technology and automation . . . has the potential to increase productivity, facilitate freight movement, create new kinds of jobs, and, most importantly, improve safety significantly by reducing accidents caused by human error." *Id*. It notes that "DOT's approach to achieving safety improvements begins with a focus on removing unnecessary barriers and issuing voluntary guidance, rather than regulations that could stifle innovation," and that "finalizing the train crew staffing rule would have departed from FRA's long-standing regulatory approach of not endorsing any particular crew staffing arrangement." *Id*. The Order suggests that the "lack of a legal prohibition means that each railroad is free to make train crew staffing decisions as part of their operational management decisions, which would include consideration of technological advancements and any applicable collective bargaining agreements." *Id*.

Despite concerns with the insufficiency or inconclusiveness of the data in the record, the last section of the Order notes that "nine states have laws in place regulating crew size," and states that the Order's intent is "to

there a specific requirement that would prohibit autonomous technology from operating a locomotive or train in lieu of a certified locomotive engineer. However, the NPRM identified several regulations that a railroad would need to be cognizant of when adjusting its crew staffing levels, while acknowledging that none of those regulations requires a minimum number of crewmembers to achieve compliance.

*Id*.

preempt all state laws attempting to regulate train crew staffing in any manner." *Id.* at 24,741.  It explains:

> Provisions of the federal railroad safety statutes, specifically the former Federal Railroad Safety Act of 1970 (FRSA), repealed and recodified at 49 U.S.C. § 20106, mandate that laws, regulations, and orders "related to railroad safety" be nationally uniform.  The FRSA provides that a state law is preempted where FRA, under authority delegated from the Secretary of Transportation, "prescribes a regulation or issues an order covering the subject matter of the State requirement."  A federal regulation or order covers the subject matter of a state law where "the federal regulations substantially subsume the subject matter of the relevant state law."  A federal regulation or order need not be identical to the state law to cover the same subject matter.  The Supreme Court has held preemption can be found from "related safety regulations" and "the context of the overall structure of the regulations."  Federal and state actions cover the same subject matter when they address the same railroad safety concerns.  FRA intends this notice of withdrawal to cover the same subject matter as the state laws regulating crew size and therefore expects it will have preemptive effect.

*Id.* **(**footnotes omitted).

The Order invokes "what the Supreme Court refer[s] to as 'negative' or 'implicit' preemption," quoting *Ray v. Atlantic Richfield Co.*, 435 U.S. 151, 178 (1978), for the proposition that "'[w]here failure of . . . federal officials affirmatively to exercise their full authority takes on the character of a ruling that no such regulation is appropriate or approved pursuant to the policy of the statute,' any state law enacting such a regulation is preempted." *Id.*

The Order concludes that the FRA has "determined that issuing any regulation requiring a minimum number of train crewmembers would not be justified because such a regulation is unnecessary for a railroad operation to be conducted safely at this time" and that "no regulation of train crew staffing is appropriate, and that FRA intends to negatively preempt any state laws concerning that subject matter." *Id.*

On July 16, 2019, the Unions were the first to file a petition for review. The California PUC filed its petition on July 18, followed by petitions by Washington and Nevada. All were timely filed within 60 days of the Order. *See* 28 U.S.C. § 2344.

## III

Before reaching petitioners' challenges to the Order's merits, we address the arguments concerning jurisdiction raised by the intervenor, the AAR. It argues that the court lacks jurisdiction over the Unions' petition because 28 U.S.C. § 2343 states that venue is proper "in the judicial circuit in which petitioner resides or has its principal office, or in the United States Court of Appeals for the District of Columbia Circuit." The argument is well taken, as the Unions' principal offices are not within the Ninth Circuit. Under other circumstances we might transfer the petition to

a sister circuit, but because we determine that we have jurisdiction over the petitions filed by the States and vacate the FRA's order, we dismiss the Unions' petition.

AAR also claims that we should dismiss the States' petitions, arguing that none of the States "participated in the crew-size rulemaking" and thus are not "parties aggrieved" and may not invoke our jurisdiction pursuant to § 2344. In support of its position, AAR argues that the comment letters submitted to the FRA by state public utilities commissions do not count as participation because the PUCs are separate entities from the states.

The FRA does not agree. It notes that the California PUC participated in the working group through the Association of State Rail Safety Managers and asserts that this "satisfies the requirement that an aggrieved party has participated in the challenged agency proceeding."

We determine that all three States are sufficiently aggrieved to invoke our jurisdiction under § 2344. All three States did participate in the proceedings. California's PUC was part of the working group, and both Nevada and Washington's PUCs submitted letters.[5]

---

[5] Citing *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 324 (2015), the AAR further argues that the preemptive effect of the Order is not ripe for decision because preemption is determined by a court, not the FRA. *Armstrong*, is inapposite. It concerned a Medicaid provider's attempt to invoke the Supremacy Clause to force state compliance with federal law. Moreover, the Supreme Court recognized that it has "long held that federal courts may in some circumstances grant injunctive relief against state officers who are violating, or planning to violate, federal law." *Id*. at 326. There is no suggestion that the court may not enjoin a federal agency from violating the APA.

**IV.**

## A.  Standards of Review

There is no doubt that the FRA could withdraw the NPRM.  Indeed, it makes sense that when the comments following the issuance of an NPRM do not convince the agency to take action, the agency should withdraw the NPRM.  But the Order does much more than withdraw the NPRM; it appears to adopt a one-person train crew rule and purports to preempt any state safety laws concerning train crew staffing.  84 Fed. Reg. 24,741.

In reviewing the challenges to the Order, we take our guidance from two recent Supreme Court opinions, *Department of Homeland Security v. Regents of the University of California*, 140 S. Ct. 1891 (2020), and *Department of Comm. v. New York*, 139 S. Ct. 2551 (2019).  In *Regents*, the Supreme Court reiterated that the APA "sets forth the procedures by which federal agencies are accountable to the public and their actions subject to review by the courts" and "requires agencies to engage in reasoned decisionmaking."   140 S. Ct. at 1905 (internal citations omitted).  The APA "directs that agency actions be 'set aside' if they are 'arbitrary' or 'capricious.'" *Id*. (quoting 5 U.S.C. § 706(2)(A)).  "Under this narrow standard of review, . . . a court is not to substitute its judgment for that of the agency, but instead to assess only whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id*.  (internal citations and quotations omitted).  The Court explained that "[i]t is a foundational principle of administrative law" that judicial review of agency action is limited to the grounds that the agency invoked when it took the action." *Id*. at 1907.

In *New York*, the Court set forth four steps for reviewing whether an agency's stated reasons for taking action are pretextual. "First, in order to permit meaningful judicial review, an agency must disclose the basis of its action." 139 S. Ct. at 2573 (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 167–69 (1962)). "Second, in reviewing agency action, a court is ordinarily limited to evaluating the agency's contemporaneous explanation in light of the existing administrative record." *Id*. "Third, a court may not reject an agency's stated reasons for acting simply because the agency might also have had other unstated reasons." *Id*. Fourth, the Court "recognized a narrow exception to the general rule against inquiring into 'the mental processes of administrative decisionmakers'" where there is "a strong showing of bad faith or improper behavior.'" *Id*. at 2573–74 (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S 402, 420 (1971)).

In *New York*, the Court found that it had been presented "with an explanation for agency action that is incongruent with what the record reveals about the agency's priorities and decisionmaking process." *Id.* at 2575. It explained that:

> [t]he reasoned explanation requirement of administrative law, after all, is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public. Accepting contrived reasons would defeat the purpose of the enterprise. If judicial review is to be more than an empty ritual, it must demand something better than the explanation offered for the action taken in this case.

*Id.* at 2575–76. The Court concluded: "We do not hold that the agency decision here was substantively invalid. But agencies must pursue their goals reasonably. Reasoned decisionmaking under the Administrative Procedure Act calls for an explanation for agency action. What was provided here was more of a distraction." *Id*. at 2576.

In reviewing the challenges to the Order, we first address the FRA's assertion that the Order implicitly preempts state safety rules. After determining that it does not, we consider whether the Order violates the APA's minimum notice-and-comment requirements and whether the Order is arbitrary and capricious. We conclude that the issuance of the Order violated the APA's notice-and-comment requirements and that the Order is arbitrary and capricious, and therefore must be vacated.

## B. The States' Safety Rules are not Negatively Preempted by the Order

The FRA correctly asserts that cases such as *CSX Transportation*, *Inc. v. Easterwood*, 507 U.S. 658 (1993), *Ray v. Atlantic Richfield Co.*, 435 U.S. 151 (1978), and *Burlington Northern Railroad Co. v. Montana*, 880 F.2d 1104 (9th Cir. 1989), confirm that an order may implicitly preempt state laws. However, the cases do not support the FRA's assertion that this Order did so.

*CSX Transportation* was an action by the widow of a truck driver killed when hit by a train. The Court held that federal regulations setting maximum train speeds on certain classes of track preempted any common-law negligence claim that the conductor was travelling too fast, despite adhering to the federal speed limit. *See* 507 U.S. at 664, 676. *Ray* concerned Washington's safety regulations for tankers entering Puget Sound. The Court held that the state's

limitation on the maximum size of a tanker that could enter Puget Sound was preempted by federal regulation but that the state's requirements of local pilotage and tug escorts were not preempted. 435 U.S. at 177–79. *Burlington* concerned whether FRA regulations preempted a state law requiring a caboose on trains longer than 2,000 feet. We held that the state regulation was preempted because it covered the same subject matter as the FRA regulations. 880 F.2d at 1105–06. But *Burlington*'s application to this litigation is limited by two factors: in *Burlington* the FRA had "promulgated two regulations affecting cabooses"; and Montana conceded that "its caboose law is not designed to reduce an 'essentially local' safety hazard." *Id*. at 1105. Each of these cases concerned conduct that was subject to existing agency regulation. Thus, although they affirm that FRA regulations can preempt state safety regulations, they do not compel a determination that the Order did so.

The Supreme Court has indicated that when reviewing challenges to agency action under the APA a court should consider the particular statutes and the facts in each case. *See Regents*, 140 S. Ct. at 1905, 1908. Here, Congress limited the preemptive effect of an FRA order by providing in § 20106(a)(2) that states may "continue in force an additional or more stringent law" that is "necessary to eliminate or reduce an essentially local safety or security hazard" and "is not incompatible with a [federal] law, regulation, or order." Thus, a state regulation is not automatically preempted by FRA action. Rather, the state regulation is preempted only when incompatible with the FRA's decision.

The Order, although declaring it "negatively preempt[s] any state laws" concerning crew staffing, does not address why state regulations addressing local hazards cannot

coexist with the Order's ruling on crew size. The Order offers an economic rationale: "a train crew staffing rule would unnecessarily impede the future of rail innovation and automation." 84 Fed. Reg. 24,740. But this is not a safety consideration. The FRA also argues that state regulations that apply statewide do not address essentially local hazards. *Id*. at 24,741 n.46. This assertion is not fully addressed in the Order and does not appear to be ripe for judicial consideration at this time.

In sum, although preemption of state safety laws is not beyond the FRA's mandate, the Order does not do so implicitly. Next, we turn to the merits of the Order.

## C. The Order Violates the APA's Minimum Notice-and-Comment Requirements

As noted by the States, the most fundamental of the APA's procedural requirements are that (1) a "notice of proposed rulemaking shall be published in the Federal Register," and (2) "the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments" for the agency's consideration. *See* 5 U.S.C. § 553(b) and (c). In *Nat. Res. Def. Council v. U.S. E.P.A.* (*NRDC II*), 279 F.3d 1180, 1186 (9th Cir. 2002), we stated that "[a] decision made without adequate notice and comment is arbitrary or an abuse of discretion" as a matter of law. We further reiterated that "a final rule which departs from a proposed rule must be a logical outgrowth of the proposed rule" and "[t]he essential inquiry focuses on whether interested parties reasonably could have anticipated the final rulemaking from the [proposed rule]." *Id*. (quoting *NRDC v. EPA* (*NRDC I*), 863 F.2d 1420, 1429 (9th Cir. 1988)).

More recently, in *Empire Health Foundation for Valley Hospital Medical Center v. Azar*, 958 F.3d 873 (9th Cir. 2020), we reasserted that: (1) a decision made without adequate notice and comment is arbitrary or an abuse of discretion; (2) under the APA the adequacy of notice turns on whether interested parties reasonably could have anticipated the final rulemaking from the proposed rule; (3) the key inquiry is whether the changes in the final rule are a logical outgrowth of the notice and comments received; and (4) a further consideration is whether a new round of notice and comment would provide the first opportunity for interested parties to offer comments that could persuade the agency to modify its rule. *Id*. at 882–883.

The States argue that the NPRM, which proposed a nationwide two-crewmember *minimum* requirement, gave no indication that FRA "would affirmatively *eradicate* all two-crewmember requirements, including those established under state law." They object that the Order "is far broader than the NPRM indicated," because it purports to preempt "all" state laws regulating train crew staffing "in any manner," which could encompass "not only the number of crewmembers, but also any non-federal requirements pertaining to topics such as education, training, and qualifications required for train crew staff." Moreover, according to the States, the FRA "did not cite *any* public comments to justify its preemption decision."

The FRA agrees that its final action is subject to the APA's rulemaking requirements and should be a logical outgrowth of the proposed rule. However, it asserts that the Order "plainly satisfies" the logical outgrowth requirement because the NPRM "provided 'fair notice' to interested parties of the possibility that the agency would determine that no regulation was appropriate," and thus the public

knew "that the agency was considering whether to allow one-person crews for 'most existing operations.'" The FRA further contends that it informed the public that it planned to approve on a case-by-case basis "operations with less than two crewmembers where a railroad provide[d] a thorough description of that operation, ha[d] sensibly assessed the risks associated with implementing it, and ha[d] taken appropriate measures to mitigate or address any risks or safety hazards that might arise from it."

AAR similarly argues that the Order is a logical outgrowth of the NPRM because it was reasonably foreseeable that the FRA would "examine the safety concerns regarding" one-person operations "and affirmatively decide that no regulation is needed." It asserts that "it was also foreseeable that the agency's final decision would preempt all state laws addressing that same subject matter."

Although federal regulation of crew size was clearly placed in issue by the NPRM, the Order's preemption of all state safety requirements was not a "logical outgrowth" of the NPRM. There was nothing in the NPRM to put a person on notice that the FRA might adopt a national one-person crew limit. Rather, the NPRM stated that the FRA was considering mandating a minimum requirement of two crewmembers. The purpose of the proposed rule was to "establish minimum requirements for the roles and responsibilities of the second train crew member." 81 Fed. Reg. 13,959. Indeed, the FRA's very argument that it had informed the public that it planned to approve on a case-by-case basis operations with fewer than two crewmembers suggests that it was not contemplating the adoption of a nationwide one-person train crew rule. The FRA does not

contend that it ever issued any notice modifying that stated purpose of the NPRM.

In sum, it appears that (1) the interested parties could not have reasonably anticipated the Order, *see Empire Health Found.*, 958 F.3d at 882, (2) the Order is not a "logical outgrowth of the notice and comments received," *id.* (quoting *Rybachek v. U.S. E.P.A.*, 904 F.2d 1276, 1288 (9th Cir. 1990)), and (3) "a new round of notice and comment would provide the first opportunity for interested parties to offer comments that could persuade the agency to modify its rule." *Id.* at 883 (quoting *NRDC II*, 279 F.3d at 1186).

## D. On This Record We Conclude That the Order is Arbitrary and Capricious and Must be Vacated

Although the Order describes itself as withdrawing an NPRM, its real and intended effect is to authorize nationwide one-person train crews and to bar any contrary state regulations. In reviewing petitioners' claim that the FRA failed to comply with the APA, we look to "whether the [FRA] examined the relevant data and articulated a satisfactory explanation for [its] decision, including a rational connection between the facts found and the choice made." *New York*, 139 S. Ct. at 2569 (citations and internal quotation marks omitted). Applying the approach set forth in *New York*, we determine that the record does not support the Order's embrace of a one-person train crew or its preemption of state laws.

### 1. The Order's Basis for Its Action Does Not Withstand Scrutiny

The Order's reasoning is problematic. It asserts that there is still no "reliable or conclusive statistical data to suggest whether one-person crew operations are generally

safer or less safe than multiple-person crew operations."  84 Fed. Reg. 24,737.  Critically, this lack of data does not support the promulgation of a one-person train crew rule and the preemption of state safety laws.

A careful reading of the Order raises substantial questions as to the soundness of its effective establishment of a national one-person crew standard.[6]   The Order recognizes that even as to the two accidents that prompted the NPRM there were "some indirect connections between crew staffing and railroad safety," but dismisses these as "tangential at best."  *Id.* at 24,738.  The Order recognizes that it is impossible to "compare the accident/incident rate of one-person operations to that of two-person train crew operations."[7]  *Id*. at 24,739.

The Order further recognizes that the Working Group identified "safety issues that railroads should consider when evaluating any reduction in the number of train crewmembers," but opines that these "reports do not indicate that one-person crew operations are less safe" and "do not form sufficient basis for a final rule on crew staffing."  *Id*. at 24,740.   The Order again recognizes "some indirect connection between crew staffing and railroad safety, such as post-accident response or handling of disabled trains," but opines that these concerns "could be achieved with fewer than two crewmembers with a well-planned, disabled-train/post-accident protocol."  *Id*.  Similarly, addressing

---

[6] Indeed, it is not entirely clear whether the Order even establishes a one-person crew requirement or permits railroads, in their discretion, to operate trains without any operator aboard the train.

[7] It stands to reason that where a two-person crew avoided an accident that might not have been avoided by a one-person crew, there would be no accident report.

whether "the idea of a one-person train crew" conflicts with existing statutory and regulatory requirements, the Order notes that no specific statute or regulation prohibits a one-person train crew, but cautions that "the NPRM identified several regulations that a railroad would need to be cognizant of when adjusting its crew staffing levels." *Id*. The Order alludes to safety concerns but does not really address them.

It is not clear that there is a sound factual basis for the Order's suggestion that two-member crews are less safe than one-person crews. The Order seems to rely on a study submitted by the AAR that allegedly shows that "single-person crew operations appear as safe as multiple person crew operations, if not safer." *Id*. at 24,737. But a single study suggesting that one-person crew operations "appear as safe" as two-person crews seems a thin reed on which to base a national rule: particularly in light of all the comments supporting a two-person crew rule and the proffered anecdotal evidence.

Indeed, the Order fails to address the multiple safety concerns raised by the majority of the comments on the NPRM. For example, the States allege that the FRA's own research "identified crewmember fatigue as a critical component of the safety-related reasons for regulating crew size," and correctly note that the Order does not discuss crew fatigue at all. The States also argue that although the FRA had previously recognized that mountainous terrain presents technical challenges and complexities that favor multi-person crews, the Order fails to consider these concerns. Rather, the Order states that the FRA "*believes*" that "post-accident responses [and] handling of disabled trains . . . *could be achieved* with fewer than two crewmembers with a *well-planned disabled-train/post-accident protocol* that

quickly brings railroad employees to the scene of a disabled train or accident." *Id*. at 24,740 (emphases added). But the Order does not require that a railroad have "a well-planned disabled-train/post-accident protocol." Moreover, with trains crossing the Sierra and Cascade mountain ranges in the winter, it seems unlikely that pursuant to the best "well-planned" protocol, assistance could quickly reach a disabled train on a mountain pass.

Even the Order's assertion that "a train crew staffing rule would unnecessarily impede the future of rail innovation and automation," *id*. at 24,740, is not explained. The Order mentions that automation may reduce accidents caused by human error, that unnecessary barriers should be removed, and that some commentators "identified the train crew staffing rulemaking as a potential barrier to automation or other technology improvements." *Id*. But there is no discussion of how a two-person crew rule would actually interfere with innovation or automation. Instead, the section asserts that "requiring a minimum number of crewmembers for certain trains . . . would have departed from FRA's long-standing regulatory approach of not endorsing any particular crew staffing arrangement." *Id*. But this begs the question of why the promulgation of a one-person crew rule does not also violate the long-standing approach of not endorsing a particular crew staffing arrangement.

Finally, even if we were to accept the FRA's assertion that a "regulation requiring a minimum number of train crewmembers . . . is unnecessary for a railroad operation to be conducted safely," this is not a sufficient reason to "negatively preempt any state laws concerning that subject matter." *Id*. at 24,741. To the contrary, Congress recognized the need to consider local conditions when it provided in § 20106(a)(2) that a state could "continue in force an

additional or more stringent law" that is "necessary to eliminate or reduce an essentially local safety or security hazard."  The FRA's assertion that it has the inherent authority to implicitly preempt state law does not address why preemption is necessary or desirable here.

Our review of the Order indicates that neither its promulgation of a one-person train crew rule nor its preemption of state safety laws fairly addresses the safety issues raised in the comments to the NPRM.

### 2. The Agency's Contemporaneous Explanation is Lacking.

An alternative motive such as economic efficiency might not render the Order arbitrary and capricious if it otherwise addressed the safety concerns which are the FRA's mandate. *See New York*, 139 S. Ct. at 2573.  As noted, the FRA "believes" that indirect safety connections "could be achieved" with fewer than two crewmembers with a well-planned disabled-train/post-accident protocol" and that it "expects" railroads to consider such protocol.  84 Fed. Reg. at 24,740.  Beliefs as to what "could be achieved" and expectations as to what railroads will do are not a legitimate ground for preempting state safety regulations. Furthermore, other than arguing that state regulations for "essentially local safety hazards" may not be "statewide in character," *see id*. at 24,741 n.46, the Order offers no safety or economic justification for preemption.

### V.

Despite the deference due FRA decisions, the States have met their burden of showing that the issuance of the

Order violated the APA's minimum notice-and-comment requirements and that the Order is arbitrary and capricious.[8]

This case recalls a case commented on by the Supreme Court in *Regents*. There the Court wrote:

> That reasoning repeated the error we identified in one of our leading modern administrative law cases, *Motor Vehicle Manufacturers Association of the United States, Inc. v. State Farm Mutual Automobile Insurance Co.* [463 U.S. 29 (1983)]. There, the National Highway Traffic Safety Administration (NHTSA) promulgated a requirement that motor vehicles produced after 1982 be equipped with one of two passive restraints: airbags or automatic seatbelts. Four years later, before the requirement went into effect, NHTSA concluded that automatic seatbelts, the restraint of choice for most manufacturers, would not provide effective protection. Based on that premise, NHTSA rescinded the passive restraint requirement in full.
>
> We concluded that the total rescission was arbitrary and capricious. As we explained, NHTSA's justification supported only "disallow[ing] compliance by means of" automatic seatbelts. It did "not cast doubt" on the "efficacy of airbag technology" or

---

[8] Because we vacate the Order on these grounds, we need not, and do not, consider the States' arguments that the Order was untimely and violates the Safety Act.

upon "the need for a passive restraint standard." Given NHTSA's prior judgment that "airbags are an effective and cost-beneficial lifesaving technology," we held that "the mandatory passive restraint rule [could] not be abandoned without any consideration whatsoever of an airbags-only requirement."

140 S. Ct. at 1912 (internal citations omitted).

Here, too, the FRA seeks to change its position without fully explaining its reasons for doing so and without following its usual proceedings for rulemaking. The FRA went from proposing, as required by safety concerns, a national *minimum* two-person train crew rule, to imposing a *maximum* one-person train crew rule and preempting state safety laws based on a record that the FRA describes as insufficient to show "whether one-person crew operations are generally safer or less safe than multiple-person crew operations." 84 Fed. Reg at 24,737. As in *State Farm*, the issue is not whether the FRA has the authority to issue a rule that preempts state safety regulations, but whether it has done so in a manner that complies with the APA. On this record, we conclude that it did not.

Accordingly, the Order is vacated, and the matter is remanded to the FRA. Although the FRA asserts that vacatur "would result in a disruptive patchwork of state laws," it appears that Congress foresaw a variety of state laws when it provided in § 20106 that states may have more stringent laws as long as they are not incompatible with federal law.

The petition filed by the Unions is **DISMISSED**. The petitions filed by California, Washington, and Nevada are

**GRANTED**, the Order, 84 Fed. Reg. 24,735, is **VACATED**, and the matter is **REMANDED** to the Federal Railroad Administration.

---

CHRISTEN, Circuit Judge, concurring:

I join parts I, II, III and IV.C of the opinion. Because "[a] decision made without adequate notice and comment is arbitrary or an abuse of discretion," *Nat. Res. Def. Council v. U.S. E.P.A.*, 279 F.3d 1180, 1186 (9th Cir. 2002), I would vacate the notice of withdrawal solely based on our conclusion that the Notice of Proposed Rulemaking did not provide adequate notice or opportunity to comment. I would not reach whether the notice of withdrawal negatively preempted state laws or whether the Federal Railroad Administration provided a satisfactory explanation for the notice.